## AIG MEXICO SEGUROS INTERAMERICANA, S.A. de C.V., Plaintiff,

v.

**M/V ZAPOTECA, her engines, tackle, boiler, etc., in rem; Zapoteca Shipping Co., Ltd. and Interorient Navigation Co. Ltd., in personam, Defendants.**

No. 05 Civ. 5887 (LAP).

United States District Court, S.D. New York.

Feb. 15, 2012.

Hill Rivkins & Hayden, LLP, By: Keith B. Dalen and Thomas E. Willoughby, for Plaintiff.

Mahoney & Keane, LLP, By: Edward A. Keane and Garth S. Wolfson, for Defendants.

Before: Hon. JOHN E. SPRIZZO, District Judge.

*Memorandum & Order*

LORETTA A. PRESKA, Chief Judge:

At this Court's October 28, 2011 pretrial conference, Defendants indicated their intention to renew their motion to dismiss this action pursuant to a forum clause in the original accomplished and signed bill of lading (which Defendants regard as the relevant contract between the parties). Plaintiff argued that this motion had previously been squarely before the Honorable John E. Sprizzo and rejected with prejudice. The parties thereafter agreed to submit letter briefing both on the preclusion ("law of the case") issue as well as the underlying dispute over the applicability of Defendants' proposed forum clause (indicating Cyprus as the proper forum). In its Order dated November 4, 2011, the Court agreed to consider these letter briefs together with any prior motions and relevant information already in the record in resolving both issues. Having reviewed all relevant materials and weighed the evidence submitted to it, the Court now makes the following findings:

A. *Defendants' Motion Is Not Precluded by Prior Orders*

Defendant's renewed motion is not precluded by any prior orders issued in

this case. Defendants have made two prior motions raising this issue at least in part. The first, Defendants' November 21, 2005 Motion to Dismiss, was denied "without prejudice" and "for the reasons stated on the record at the aforementioned Oral Argument" by Judge Sprizzo's Order dated March 6, 2006 [dkt. nos. 10, 11, 15]. At the oral argument, Judge Sprizzo observed that additional discovery would be necessary to establish by a preponderance of the evidence that the parties had agreed to Defendants' asserted forum selection clause and it was therefore enforceable. *See* March 3, 2006 Oral Argument Transcript ("Hearing Tr.") at 42–51 (attached). Judge Sprizzo specifically stated to Defendants that after discovery, "[i]f you have another motion you want to file, you can file it." Hearing Tr. at 51.

■ After certain minimal discovery took place Defendants made another contract forum motion. The parties met for a Pre–Motion Conference on May 1, 2006, wherein Defendants also discussed their intention to file a Motion to Dismiss for Forum Non Conveniens. In his Order dated May 9, 2006 [dkt. no. 16,] Judge Sprizzo granted Defendants leave to file the Motion to Dismiss for Forum Non Conveniens, noting only that "as discussed at the aforementioned Conference, defendants' Motion to Dismiss for Improper Venue, shall be and hereby is withdrawn." This Court sees no reason to believe that Judge Sprizzo rejected the contract forum selection arguments with prejudice prior to full discovery. Similarly, Judge Sprizzo appears to have specifically anticipated some later motion on these grounds upon the completion of a period of discovery. For these reasons, this Court concludes that Defendants' renewed Motion to Dismiss pursuant to the contract forum clause is not precluded by any prior order.

**B.** *Defendant Has Demonstrated the Enforceability of the Forum Selection Clause by a Preponderance of the Evidence*

■ Absent fraud or undue influence, forum selection clauses should be readily enforced against contracting parties. *See generally M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 8, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *see also Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 537–38, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995). Further, a broad forum selection clause governing "all" claims arising under the bill of lading extends to non-signatories connected to the carriage even where those claims arise outside the four corners of the contract itself (i.e., tort or bailment liability). *See, e.g. Thyssen Inc. v. M/V Markos N,* No. 97–cv–6181, 1999 WL 619634, *4–7 (S.D.N.Y. Aug. 16, 1999) (analyzing broad arbitration clauses in bills of lading); *Robalen, Inc. v. Generale de Banque, S.A.,* No. 97–cv–887, 1998 WL 148413, at *2 (S.D.N.Y. Mar. 30, 1998). Where a Defendant can be made liable for a breach of any duty under a bill of lading, it is entitled to assert any additional provisions of the same bill that it finds beneficial or provide it a defense to the action. *See F.D. Import & Export Corp. v. M/V Reefer Sun,* 248 F.Supp.2d 240, 248–49 (S.D.N.Y.2002); *Reed & Barton Corp. v. M/V Tokio Express,* No. 98–cv–1079, 1999 WL 92608, at *2 (S.D.N.Y. Feb. 19, 1999). In the Second Circuit, district courts have treated a pre-trial motion based on the presence of a forum selection clause as a Motion to Dismiss under either Fed. R.Civ.P. 12(b)(3) or 12(b)(6). *See, e.g., Jockey Int'l, Inc. v. M/V Leverkusen Express,* 217 F.Supp.2d 447, 450–51 (S.D.N.Y. 2002); *J.B. Harris, Inc. v. Razei Bar Indus., Ltd.,* 37 F.Supp.2d 186, 188 (E.D.N.Y. 1998), *aff'd,* 181 F.3d 82 (2d Cir.1999).

### 1. *Pre–Discovery Contract Dispute*

There is no serious dispute that should Defendants' proffered "original" bill of lading be deemed the correct and enforceable agreement of the parties, its "LAW AND JURISDICTION" clause requires that any claim or dispute be brought in "the principal place of business of the Carrier." *See* Defendants' Memorandum of Law in Support of Motion to Dismiss ("Def. Mem.") at 5, [dkt. no. 11]. Defendants contend that the bill of lading's "IDENTITY OF CARRIER" provision makes clear that the vessel's owner, Zapoteca Shipping Co. Ltd. ("Zapoteca"), is the carrier. (*Id.* at 5–6.) Zapoteca's principal place of business is Cyprus.[1] (*Id.* at 6.) Instead, Plaintiff proffers an alternative unsigned and non-negotiable bill of lading with a forum selection provision pointing to Hamburg, Germany (and not, importantly, to New York or even the courts of the United States) in order to raise a fact question as to the binding effect of the "original" signed bill and its forum selection clause. *See generally, e.g.,* Hearing Tr. at 1–52; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. Mem.") at 2–6, [dkt. no. 14]. Prior to discovery, Judge Sprizzo concluded that the Court lacked sufficient evidence to make a determination one way or the other as to which bill of lading, if any, controlled the forum selection question. *See* Hearing Tr. at 34 ("I don't think I have any basis to find there was an agreement as to one place or the other."). Judge Sprizzo went on to observe that without discovery on the contract formation issue, "this is one of those classic cases where the scales are in equi-librium; and, therefore, you can't find for either side." *Id.* at 51.

### 2. *Post–Discovery Evidentiary Showing*

 Following a significant period of discovery in this case, this observation is no longer accurate. Defendants have demonstrated to the Court's satisfaction the following facts: (1) Defendants' proffered signed original bill of lading states on its face that "IN WITNESS WHEREOF the number of original Bills of Lading stated above all of this tenor and date have been signed, one of which accomplished the others to stand void"; (2) said original bill of lading was "accomplished" when it was endorsed; (3) Plaintiff's deponent "most knowledgeable about the bills of lading," Ms. Sofia Edith Sosa, identified the signed original bill of lading as the relevant bill for the cargo transported aboard the Zapoteca; (4) Ms. Sosa further testified that a signed original bill of lading would have been necessary for any shipment involving a letter of credit, as here; (5) Plaintiff's own expert, Estanislao Mallo, appended to his investigation report the signed original bill of lading proffered by Defendants; (6) Plaintiff's Spanish head of plant operations, Baldomero Gardea, testified that it was the practice in worldwide commerce for the recipient of goods to present an original rather than unsigned non-negotiable copy of a bill of lading in order to collect the cargo at the shipment destination; and (7) no witness for the Plaintiff testified that there was any confusion over which document was the actual bill of lading under which the Zapoteca cargo moved. *See generally* Defendants' Letter to the Court dated October 31,

---

1. On this point Plaintiff makes a colorable claim that even if this Court were to find that Defendants' proffered bill of lading is enforceable, this forum selection clause actually points to Germany, as it was the German time charterer H. Stinnes that actually issued the bill of lading and was the "carrier" for this purpose. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. Mem.") at 6–12, [dkt. no. 14]. For the reasons below, however, the Court need not resolve that hypothetical dispute to decide the pending motion and therefore leaves it for the finder of fact in an alternative forum.

2011, with exhibits ("Def. Letter Brief"), attached.

In Plaintiff's Letter to the Court dated November 1, 2011 ("Pl. Letter Brief"), attached, Plaintiff simply observes that Ms. Sosa received both bills of lading marked "original" and bills of lading marked "non negotiable" from the agent for the vessel interests and that each contained a different jurisdiction clause. Plaintiff further argues that "the ambiguity created by the two bills of lading has not been explained away by defendants" through discovery. See Pl. Letter Brief, at 2. The Court notes that this is little more than a recitation of the alleged question of fact that is the subject of the motion *sub judice.* Moreover, Defendant has demonstrated that in spite of any initial ambiguity between the versions of the bills of lading, it is its proffered signed original version that was "accomplished" and therefore all other are "to stand void." Similarly, Plaintiff does not at all rebut the testimony of its own witnesses that Defendants' proffered signed original bill of lading would have been required and expected in light of the letter of credit or would have been required upon collection of the cargo. Finally, Plaintiff does not rebut the fact that its own testifying expert apparently regarded Defendants' proffered bill of lading as the relevant contract between the parties. Nor has it produced any person or document tending to show that Plaintiff was aware of the supposed ambiguity between the bills or relied upon it in any way prior to this litigation.

Defendants need not, as Plaintiff appears to suggest, explain away the very existence of the different term in Plaintiff's proffered unsigned non-negotiable bill of lading. Defendants need only make a showing by a preponderance of the evidence that their proffered signed original bill of lading was the knowing agreement of the parties. At the close of discovery and upon the evidence now presented to it, this Court concludes that Defendant's proffered bill of lading is more likely than not the contract governing this case. As such, because the relevant bill of lading vests jurisdiction and venue for this dispute in the principal place of business of the Carrier, *supra,* and this Court is to treat Defendants' invocation of this provision as a motion to dismiss the action, see *Jockey Int'l, Inc.,* 217 F.Supp.2d at 450–51; *J.B. Harris, Inc.,* 37 F.Supp.2d at 188, *aff'd,* 181 F.3d 82, the case must be dismissed with prejudice to re-filing it in the Southern District of New York.

### 3. *Prejudice to Plaintiff*

█ The Court is mindful of Plaintiff's argument that renewal of this motion on the eve of trial creates a special hardship. See Pl. Letter Brief, at 2. But forum-selection clauses are presumptively valid matters of contract and unencumbered by the multi-factor analysis that would accompany a motion to dismiss for *forum non conveniens. See M/V Sky Reefer,* 515 U.S. at 537–38, 115 S.Ct. 2322; *Effron v. Sun Line Cruises, Inc.,* 67 F.3d 7, 10 (2d Cir. 1995). As such, this Court's discretion is limited. Moreover, whatever lack of fairness Plaintiff claims results from this decision is at least equaled by the prospect of subjecting Defendants to trial in a forum they have specifically contracted against. See *M/S Bremen,* 407 U.S. at 15, 92 S.Ct. 1907 (noting the particular harms to global industry and commerce that would result if "notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts"). More to the point, even Plaintiff's own proffered bill of lading points *away* from the courts of the United States. See, e.g., Pl. Mem. at 2; Hearing Tr. at 2 (arguing that the second bill of lading would vest jurisdiction and venue in Germany). Neither of the two bills of

lading presented nor any of the significant geographic points of contact in this case (Mexico and Spain) implicates the courts of the United States.

### 4. *Waiver*

■ The Court rejects Plaintiff's argument that Defendants are otherwise amenable to suit in the United States by virtue of the vessel interests' voluntary Letter of Undertaking ("the Letter") to the Plaintiff in 2005 in order to avoid arrest of the M/V Zapoteca in a U.S. port. *See* Pl. Mem. at 1–2. The Letter specifically stated that it was "entirely without prejudice to any rights or defenses which the said vessel and/or Owner of said vessel may have, none of which is to be regarded as waived." *See* Def. Mem. at 8. Implicit in Plaintiff's argument is the assertion that a theory of *in rem* or *quasi in rem* jurisdiction may be substituted for the explicit contractual rights of the parties before the Court. This is contrary to law. *See, e.g., Bison Pulp & Paper Ltd. v. M/V Pergamos,* No. 89–cv–1392, 1995 WL 880775, at *16 (S.D.N.Y. Nov. 29, 1995) ("If the ability of the plaintiff to tie up the ship meant that the previously agreed-to forum choice could be routinely negated as the price for release of the vessel, the policy, espoused by the Supreme Court in *Bremen,* of honoring pre-suit forum agreements would be substantially weakened."). As in *Bison Pulp,* the Letter is insufficient to overcome the effect of the mandatory forum selection clause at issue here.

### CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the action [dkt. nos. 10–11, 48] is GRANTED. The Clerk of the Court shall mark this action closed.

SO ORDERED.

(Case called)

(In open court)

THE COURT: Who wants to be heard first?

MR. WOLFSON: Good afternoon, your Honor. Garth Wolfson from—

THE COURT: Who made the motion?

MR. WOLFSON: We did.

THE COURT: Then you go first.

MR. WOLFSON: The first thing I want to address, just off the top, is there was some confusion after the briefing about the bill of lading. The bill of lading that was disclosed to us in the course of discovery had principal place of business language in the forum selection clause; and plaintiff came back saying, actually, it's Germany—

THE COURT: Well, which is it?

MR. WOLFSON: Well, our position in the first instance is that—

THE COURT: How do I tell?

MR. WOLFSON: Well, our position in the first instance is the bill of lading that was disclosed by plaintiff in the course of discovery, that's the bill of lading that they should be estopped from contesting. To come in later with the Hamburg bill of lading we think is off base.

However, I really don't think it's necessary to get into that, inasmuch as neither bill of lading calls for jurisdiction in the Southern District of New York—

THE COURT: Except that the case is here pursuant to the attachment.

MR. WOLFSON: Right, but that—

THE COURT: That's a big part of the jurisdictional content, at least for their purposes.

MR. WOLFSON: Not for the forum selection purposes.

THE COURT: I say the forum selection clause is a reason to send the case somewhere else, so long as I knew that's based upon the parties have agreed to go to one

place or the other, but these parties haven't agreed.

MR. WOLFSON: But they've agreed that it will go to an exclusive forum other than the District of New York.

THE COURT: I know, but that doesn't help me at all.

MR. WOLFSON: Well, it does, inasmuch as, your Honor, when the case is dismissed, you don't need to say the case has to go to Cyprus or to Germany. It could be enough to say it's either Cyprus or Germany, but it's not here, and I think there are many cases where there are multiple option forum selection clauses, for example, saying that plaintiff—

THE COURT: Yeah, but these forum selection clauses are all contained in one bill of lading.

MR. WOLFSON: That's right, and in one bill of lading, there is often forums—

THE COURT: Which is crazy because usually bills of lading are issued in triplicate or quadruplicate or something, but it's the same bill, though. They don't have different terms.

MR. WOLFSON: Your Honor, I think we have the same bill of lading issued. It wasn't like there was a—

THE COURT: I know, but how can it be the same bill of lading when it has a different forum clause and a different choice-of-law clause?

MR. WOLFSON: Your Honor, we are depending on the plaintiff. The plaintiff disclosed that bill of lading to us. The plaintiff disclosed both bills of lading to us, and the point is if it could be in one or multiple—

THE COURT: Do you want to consent to go to Hamburg?

MR. WOLFSON: Your Honor, I'd have to go to my client—

THE COURT: If you're not going to consent to go to Hamburg, then your argument is meaningless. The plaintiff is here and wants to stay here. And they say it should be in Hamburg. You say it should be in Greek or Cyprus where the laws with respect to that are reasonably good from your point of view and where your client isn't liable. They don't want to go there.

MR. WOLFSON: But the point is that it shouldn't be here and the dismissal—

THE COURT: I don't dismiss a case unless I know that it's going to go somewhere.

MR. WOLFSON: Well, exactly, your Honor, and—

THE COURT: And I'm not going to sit here and just guess.

MR. WOLFSON: No. We have two alternative—

THE COURT: Otherwise, there would be no point in them arresting the vessel. The reason why they arrested the vessel is because they wanted to have one sure place to find your client. All right? And they've got it here.

MR. WOLFSON: Your Honor, the vessel was arrested for security purposes, and they had that security—

THE COURT: Land jurisdiction—

MR. WOLFSON: If they didn't have jurisdiction, it doesn't defeat the forum selection clause and the—

THE COURT: But the problem is I don't know what the forum selection clause is.

MR. WOLFSON: Your Honor, we can take—

THE COURT:—forum selection clause, assuming that they're not dispositive, I waive them, among other factors in deciding whether to dismiss. A forum selection clause isn't dispositive even in a transfer case, but it's entitled to some weight. The

trouble is I don't know what the forum selection clause is.

MR. WOLFSON: First of all, your Honor, we'd be willing to accept. Plaintiff says it's the Hamburg forum selection clause—

THE COURT: Do you want to go to Hamburg?

MR. DALEN: Your Honor, I'd rather stay here.

MR. WOLFSON: Your Honor, if I could address the issue about your Honor's discretion, I do think—and I believe this came up in the premotion conference we had. I do think that your Honor's discretion in a Sky Reefer or forum selection motion is not equivalent to discretion the Court would have in a motion to transfer venue or a forum non conveniens motion. And I think in the preliminary—

THE COURT: If anything, I have more discretion on a dismissal than I do on a transfer.

MR. WOLFSON: I will disagree with that, your Honor.

THE COURT: You're wrong about that. The Second Circuit—you're wrong, for sure.

MR. WOLFSON: Your Honor, I would just direct Your Honor's attention to the cases cited in our brief—

THE COURT: I'm familiar with the Second Circuit cases that say I don't dismiss unless I'm sure there's an adequate forum somewhere else. That's what the Second Circuit cases said.

MR. WOLFSON: The plaintiff has conceded they've already commenced suit in Germany.

MR. DALEN: Your Honor, we have not.

THE COURT: Have you?

MR. DALEN: We have not commenced suit in Germany.

MR. WOLFSON: I apologize, your Honor. I was told there was a claim in Hamburg at the premotion conference, and if I'm mistaken—

THE COURT: Does anybody really know what's happening here?

MR. WOLFSON: I was told that the plaintiff had a claim in Hamburg against the charterer Stinis. That's what I meant to say. And if that's mistaken, I was only relying on what I heard from the plaintiff's counsel at the last conference, which was before your Honor, in fact.

But there is an alternate forum. Plaintiff has conceded that the Hamburg forum selection clause would apply. They've even said, okay, not Cyprus. Let's go to Hamburg. Your Honor raised this point. In response to your Honor's point, for the purpose of this motion, fine, we'll concede. Okay. You choose this bill of lading you want to sue under—

THE COURT: Yeah, but your motion is not to transfer to Hamburg. Your motion is to transfer to Cyprus, and that motion is going to be denied.

MR. WOLFSON: Well, your Honor, then we'd have to be back here with another motion where we can say okay—

THE COURT: Well, come back with another motion, but I'm not going to consent to go to Hamburg.

MR. WOLFSON: Your Honor, we shouldn't be penalized because plaintiff decided to switch the bill of lading on us. They gave us the Cyprus bill of lading. Then they said—then they gave us the Hamburg for the first time after the motion was briefed. So I don't think it would be fair or appropriate to suggest that we should have to—our motion should be dismissed and we should be back here all over again. We'd make the same motion based on the Hamburg forum selection clause.

The point is our client does not want to be here. He wants to be in Europe. He wants to have the statutory regime that was applicable. U.S. law has nothing to do with this case, your Honor. U.S. law is completely—

THE COURT: Actually, I think Hamburg has very little to do with this case either.

MR. WOLFSON: Well, your Honor, I believe—

THE COURT: If the course of action is relative anyplace, it's in Mexico or Spain. The goods were loaded on board in Mexico, and they were found defective in Spain; and, therefore, all the relevant witnesses with respect to any inherent vice in the cargo or what's happened on the transport of the ship would prove very likely not located in either Cyprus or Hamburg. What you have in Hamburg is somebody that issued a bill of lading in Hamburg. That's it.

MR. WOLFSON: You're correct, your Honor. By order of the Hague–Visby rules, their domestic equivalent, they were adopted in all of those countries. If I'm not mistaken, I believe Spain and Mexico and Germany would all have adopted either the Hague–Visby rules or in their domestic law have the equivalent of the Hague–Visby rules. That's the statutory regime which the parties expected during this shipment.

THE COURT: Are you talking about, like, COGSA limitations or what?

MR. WOLFSON: As far as the COGSA limitations, I consider them to be more favorable to the plaintiffs. It's higher than the COGSA factors and limitations. But I agree that the COGSA has nothing to do with this case.

THE COURT: Well, time is not going to be barred either way, either in the law of Spain or the law of Mexico.

MR. WOLFSON: Or as called for in the bill of lading. But in any event, none of that has anything to do with the U.S. U.S. COGSA has nothing to do with the reasonableness of this clause. I mean, it would basically—plaintiff has argued that basically anyone who doesn't like Hague–Visby or whatever their law is can come to the U.S. court, and suddenly it will be measured against COGSA, and if it's less than what COGSA guarantees—

THE COURT: Well, COGSA only applies to goods that are transported into or from the United States.

MR. WOLFSON: That's correct, Your Honor, and that's why we think it's a big red herring for plaintiff to be citing cases—

THE COURT: Let me find out why you want to stay here.

MR. DALEN: May I speak, your Honor?

THE COURT: Yeah. Go ahead.

MR. DALEN: First, if I can address the issue of—

THE COURT: I mean, if you had a bill of lading that says Hamburg, why are you unhappy with that?

MR. DALEN: Your Honor, We're here because there's a quasi-in-rem action against the vessel—

THE COURT: I understand that, but you also have the forum selection clause which you first claim was in Hamburg. So why are you backing off of that now?

MR. DALEN: Your Honor, when we were given—the first bill of lading we received clearly said it was Hamburg. I—

THE COURT: You knew that at the time you shipped your product. Right?

MR. DALEN: I'm sorry, your Honor?

THE COURT: I mean, whoever got—I guess the shipper knew that, and you're standing in the shoes of the shipper.

MR. DALEN: Except for the fact that they issued two bills of lading, one for Hamburg and one for the principal place of business of the business, the carrier, which defendants have moved to send to Cyprus. They made the motion, your Honor, to send it to Cyprus.

THE COURT: I understand. That motion I can't grant because there's no way I can tell by a preponderance of the evidence, which I'd have to do to send it anywhere, that the forum selection clause provided—I can't pick and choose among these two forum selection clauses because there's no way for me to know which one is the real one because they were both theoretically issued at the same time, and they're both different. I've never had a case like that where I've got a bill of lading which is issued at the same time and, yet, has differing terms. It doesn't make any sense.

MR. DALEN: How are plaintiffs to know, then?

THE COURT: I know, but, see, you were proceeding upon the assumption that there would be a forum selection in Hamburg, that Hamburg law applied. Now, if that's what you assumed at the time and he's saying that's what you assumed at the time, why should you be held to that choice?

MR. DALEN: Except for the fact that the carrier issued two bills of lading, one that—

THE COURT: What you say is there's no meeting of the minds.

MR. DALEN: I'm sorry?

THE COURT: What you're saying is that there's no meeting of the minds. They intended one thing, and you intended another.

MR. DALEN: Precisely.

THE COURT: And that's one reason why I have a problem.

MR. DALEN: Now, I might also add, your Honor, that—

THE COURT: Forum selection clauses are based upon agreement.

MR. DALEN: That's correct.

THE COURT: And if he had one idea of where the case would be heard and you had another, then there was no agreement as to a forum; and if there was no agreement as to a forum, there is no forum selection clause that I can enforce.

MR. DALEN: And that is our position, your Honor.

THE COURT: Well, that's where I sort of come out.

MR. WOLFSON: Your Honor, may I respond?

MR. DALEN: Your Honor—

THE COURT: I need to deal with the agreement. Are not forum selection clauses based upon agreement?

MR. WOLFSON: Yes, your Honor, but it's—

THE COURT: But how can I have an agreement if you thought it was one thing and he thought it was another?

MR. WOLFSON: Your Honor, that's not what happened. There were not two bills of lading issued by the carrier.

THE COURT: That's not the point. What do you think was the proper forum?

MR. WOLFSON: We were relying on the plaintiff to give us the bill of lading. We didn't have it.

THE COURT: No. You issued the bill of lading.

MR. WOLFSON: No. It was issued by the charterers—

THE COURT: I know, but the charterer is your agent, basically, isn't it?

MR. WOLFSON: I wouldn't call it an agent. It's a chartering relationship.

THE COURT: They chartered your ship. Right?

MR. WOLFSON: Yes.

THE COURT: And your ship owner operates the ship. This is not a barebones charter. So, therefore, the ship owner is liable too. Right?

MR. WOLFSON: Typically, yes.

THE COURT: All right. Typically? Well, not "typically." Always, yes, in the absence of a barebones charter. So you hire the crew. If anything happens on board the ship, the ship owner is responsible. Now, the bill of lading is issued by the charterer, but if the charterer believed that the forum selection clause was in Cyprus, as you first contended, and he believed that it was in Hamburg, where is the meeting of the minds?

MR. WOLFSON: Your Honor, my point was not that there were two bills of lading issued. My point is there was one bill of lading with one set of terms issued. Plaintiff was just confused as to which one it was.

THE COURT: There were two bills of lading issued at the same time.

MR. WOLFSON: No. We're talking about the terms on the back, your Honor. There's one bill of lading typically issued in triplicate, and there's a set of terms—

THE COURT: If they had differing terms, they're not the same—

MR. WOLFSON: They don't.

THE COURT: They do. They have the difference as to where it should be, and they're different as to what law is applicable. How much more different could they be?

MR. WOLFSON: They were copies, your Honor. What—

THE COURT: They're not copies. That's the point. If they were copies, I wouldn't have a problem.

MR. WOLFSON: What happened is there was an old terms and a new terms. Plaintiff, from wherever they got them, dug up the wrong terms. Then they backed down and said, no, no, no, this was the bill of lading—

THE COURT: I certainly can't resolve that one without discovery and a hearing.

MR. WOLFSON: Well, your Honor—

THE COURT: You're all not witnesses. You don't know what happened.

MR. WOLFSON: They are asserting it is the Hamburg clause. We're willing to go with whatever bill of lading—

THE COURT: They're saying, in a word, that's what they understood the forum selection clause to say. You said in your motion you understood it to be something else.

MR. WOLFSON: Until they turned around after the motion and said it's actually Hamburg, at which point we're telling your Honor we'll take that one—

THE COURT: You want to take a forum selection clause now?

MR. WOLFSON: Of course. We want to assert the Hamburg clause. We don't know what it is until they tell us. They switched the—

THE COURT: You know what it is.

MR. WOLFSON: We know what it is when they gave it to us. We did not have a copy in our files until the plaintiff produced it.

THE COURT: And where did the other one come from?

MR. WOLFSON: From the plaintiff, your Honor. The first bill of lading—the face of the bill of lading is the same, except the other page on which terms apply. The

first one with Cyprus came in plaintiff's discovery response, nothing about Hamburg. The Hamburg one came after the motion was—

THE COURT: Your charterer doesn't have a copy of his own bill of lading?

MR. KEANE: If I can just be heard.

THE COURT: Well, why am I hearing from two lawyers?

MR. KEANE: I was involved in the selection of the bill of lading for the purposes of the motion, and I thought I could interject into how that developed. If you don't want to hear from me, that's fine.

THE COURT: Well, where did the Hamburg bill come from?

MR. KEANE: There was reference to the Hamburg bill, apparently, in the first conference before your Honor.

THE COURT: By whom?

MR. KEANE: From plaintiff's counsel.

THE COURT: You said Hamburg.

MR. DALEN: Your Honor, Mr. Willoughby was present here, and he mentioned that the bill of lading that we thought existed said Hamburg.

THE COURT: Right. Now, how did they get the other one?

MR. KEANE: If I can be heard.

THE COURT: I mean, he says you produced—

MR. DALEN: Your Honor, these documents were created by Stinis. The issuer of the bill of lading was created by them and given to my clients at one time or another. My clients gave them to me. I just passed them on to the defendant.

I might add, your Honor, that I provided the bill of lading with the Hamburg clause to the principal of the P & I Club. They acknowledged that they received the bill of lading that says Hamburg. I then—when I received the original bill of lading, I assumed that the terms are the same on the back. So I sent them, in terms of my document production, to the other side. I had no idea that the carrier had issued two different bills of lading.

MR. KEANE: Your Honor, as I say—

MR. DALEN: And, your Honor, if the carrier chooses to issue two bills of lading, that's not my fault.

THE COURT: No. I know it's not your fault.

MR. KEANE: Historically, going back to what happened, there was reference to the Hamburg clause. I, whether right or wrong, constrained myself to the official production of documents for plaintiff. They were Bates-stamped documents. When we were first presented with the fact that we were moving on the different clause in the Hamburg and plaintiff initially said where did you get them, whatever, we produced back to them the Bates-stamped numbers and—

THE COURT: Cyprus?

MR. KEANE: Yes.

THE COURT: Which bill did he give you, the Cyprus bill or the Hamburg bill? He says he gave you the Hamburg bill.

MR. KEANE: No. He conceded that what was produced to us in the document discovery along with the rule 26 disclosures was the Cyprus bill of lading, and that's in writing. And that was—maybe I'm crazy, but that was, in my view, the document plaintiff was producing and relying upon in its suit for cargo damage under a bill of lading. So I moved on that. I equally would have said "move on Hamburg" if that had been produced to us.

THE COURT: How was the Hamburg one produced?

MR. KEANE: The Hamburg one, as far as I'm concerned, there's no pedigree for it at all. My—

THE COURT: There has to be pedigree because somebody referred to it. How did you get the Hamburg bill?

MR. DALEN: Your Honor, I produced that to the P & I Club, with whom I originally was dealing with, back before February 2005. In fact, I have an e-mail from the club here acknowledging that there was a German jurisdictional clause in that bill of lading that they received.

THE COURT: So I'm just trying to follow this.

MR. DALEN: Okay. When I first—

THE COURT: When did you give them the Cyprus bill? Is that in your complaint? Is the Cyprus bill referred to in your complaint?

MR. DALEN: Your Honor, I didn't even know that that bill of lading with the clause saying the principal place of business of the carrier—I didn't even know that I had that. I was only aware—at the time that I was first given a copy of the bill of lading, I looked at the back, and it said Hamburg. I then took that document and filed claim with the P & I Club. The P & I Club acknowledged that there was a German jurisdictional clause in there.

Then sometime during the case, whether I got it from the vessel owner or I got it from my client, I received what was called the original bill of lading and—

THE COURT: It was the original?

MR. DALEN: Right. It was stamped the original. But I assumed the terms were the same on the back.

I then, doing my document production, gave a copy to counsel. Lo and behold, when they make their motion, I look at it, and I see the carriers issued two bills of lading, one that clearly says Hamburg and the other that says principal place of business of the carrier. So at that point in time, I had two different bills of lading. I had two different clauses. And that's my position. I don't know what clause applies.

MR. KEANE: In all likelihood, only one was actually issued, and I suggest—

THE COURT: How can that be?

MR. KEANE: Well, because I think it's not uncommon to have a pro forma prepared, and oftentimes it's actually changed when the true bill of lading is issued. Either they make a conscious decision that the pro forma, the draft one—

THE COURT: But we don't have testimony about this. I have no testimony about any of this.

MR. KEANE: I know you don't.

THE COURT: So how can I resolve it?

MR. KEANE: We moved on the plaintiff's rule 26 production to us, in the event that—they should be estopped, but I don't hold them to that—

THE COURT: There is no estoppel here because they never got any benefit from that—

MR. KEANE: We shouldn't be prejudiced, certainly, for—

THE COURT: You only get estoppel as a result of him taking the position he gets a benefit from—

MR. KEANE: We—

THE COURT:—benefit—

MR. KEANE: I don't even seek that, your Honor. What I seek is not to prejudice my client's position by virtue of moving on a bill of lading that they produced in the course of litigation as opposed to some hearsay in court or wherever the third party is. However—

THE COURT: Hearsay?

MR. KEANE: Well, in other words—

THE COURT: The two documents are in front of me. That's not hearsay.

MR. KEANE: Well, Mr. Willoughby is saying it was a German—I was not going to move on his comments in court that it

was a German jurisdiction clause, nor was I going to move on documents that may have been sent to a P & I Club. I was going to move on the documents that were duly produced in the course of this litigation. If that was a mistake, my client shouldn't be prejudiced by it.

That then leaves us where shall we go from here. Our position is it doesn't matter which bill of lading is deemed to be the governing one, which was actually issued, because either one has a forum clause, a forum for jurisdiction, other than the U.S. The case law that they rely on is exclusively—

THE COURT: Yes, but you're missing the point that a forum selection clause is a matter of contract—

MR. KEANE: If there was no contract—

THE COURT: —and it does make a difference whether both sides agree to the same contract.

MR. KEANE: If there was no contract, then my client should be dismissed because there was no—

THE COURT: Well, that—

MR. KEANE: —claim against them—

THE COURT: —jurisdiction. I can proceed on that basis.

MR. KEANE: With no valid bill of lading.

THE COURT: With no forum selection clause.

MR. KEANE: With no contract whatsoever.

THE COURT: That's right.

MR. KEANE: The whole contract—

THE COURT: Then I apply choice-of-law principles in accord with New York law, and I arrive at the law of the more significant contracts, which would be Mexico or Spain.

MR. KEANE: Whatever law they have governing, no bill of lading had been issued for—

THE COURT: That seems to be the wiser course to go from everybody's point of view. You're going to have to bring a lot of witnesses over there to litigate this case in Germany or in Cyprus.

MR. KEANE: You could send it to Mexico with no bill of lading, or Spain—

MR. DALEN: Your Honor, can I be heard? My complaints—

THE COURT: I don't have that motion in front of me anyway.

MR. DALEN: My complaint are two causes of action, one under the bill of lading, the other one bailment, which would be obviously—has nothing to do with the bill of lading. They were bailees.

THE COURT: Yeah, see, the forum selection clause would govern both, though, if there were a contract, but my problem is I don't think there's a contract here. There's no agreement. You're all willing to make an agreement now, which is why I said to you if you're willing to stipulate to go to one place or the other, fine with me. I don't care. But he's not willing to enter into that stipulation now; and, therefore, I have to found that there was an agreement then, and I don't have any basis to find there's an agreement then.

MR. KEANE: There surely was an agreement. Somebody presented a bill of lading to—

THE COURT: But it's not the same agreement.

MR. KEANE: It is one of those two agreements we're moving for.

THE COURT: It is one of those two? As I say, I have a contract to buy a car or a plane. It's one of the two. They're not the same contract.

MR. KEANE: Then I would ask leave from the Court to have limited discovery on the issue of which bill of lading was presented to recover the cargo after the ship discharged it, and then we can make a motion on whatever bill of lading that is. The complaint has a bill of lading appended to it. Rule—

THE COURT: But we're going to have to hear from your charterer as to how—

MR. KEANE: They're not here, Judge. They're not subject to this jurisdiction.

THE COURT: You'll have to do discovery on those people on how they issued two different bills of lading.

MR. KEANE: We don't need the discovery from Stinis. We need the discovery from the plaintiff. What bill of lading did they collect and present to the ocean carrier in order to retrieve their cargo? They have that information. This is silliness. And their complaint says it is—the declaration says the bill of lading covering the cargo shipment was issued.

THE COURT: But I have to assume that the bill of lading they received from you to release their cargo was the same bill of lading that was issued at the same time as the transaction took place.

MR. KEANE: Of course it was.

THE COURT: But if it's not, it's not.

MR. KEANE: Judge, that really flies in the face of all logic. They got a bill of lading that was their contract of carriage. They kept it and returned it at the delivery point to the ship and collected their cargo. If that's a dispute, I'm ready to listen to it, but I suggest that it's not. And if we can just have limited discovery on that, then we can make our motion, but surely one of the two bills of lading at issue is going to be the governing contract—

THE COURT: And where did the governance go?

MR. KEANE: I don't think they were ever issued. I think they went into some German's garbage can.

THE COURT: Who?

MR. KEANE: Stinis, the charter who is not here.

THE COURT: Where is his copy?

MR. KEANE: I don't know.

THE COURT: That was his copy, you said.

MR. KEANE: I am saying that some clerk in some office probably prepared a nonnegotiable or a form that was never executed—

THE COURT: If that flies—

MR. KEANE: There's only one bill of lading covering this shipment, Judge. These ships don't carry—

THE COURT: I read your papers, and it's just not so.

MR. KEANE: My papers are based on the plaintiff's production of documents—

THE COURT: Well, maybe your papers should have been based upon your own work and not his.

MR. KEANE: I don't think I need to. I think I can rely upon—the plaintiff—

THE COURT: You have a burden to persuade me to enforce the forum selection clause, and maybe you should have checked your own files over there in Germany to find out—

MR. KEANE: It's not my client. Otherwise, I would have, but I am entitled to rely upon the production of documents—

THE COURT: Who is your client?

MR. KEANE: My client is Interoceánica and the owners—

THE COURT: Do you think they might have a copy of the bill of lading?

MR. KEANE: They don't. I've asked. They have to go to Stinis. Stinis issued the bill of lading. They're the charterer. As you said, many charter parties allow the charterer to issue the—

THE COURT: Don't they have to collect the bill of lading to release the cargo?

MR. KEANE: Some agent does.

THE COURT: But doesn't the shipper?

MR. KEANE: The shipper—

THE COURT: The carrier—

MR. KEANE: Absolutely.

THE COURT: The carrier is the one who should have the bill of lading.

MR. KEANE: "The carrier" is a bit of a loose term, but Stinis' agent is—

THE COURT: All I'm saying to you is that there's a person who will have the document that was used to release the cargo, but that person is not him.

MR. KEANE: Oh, it is.

THE COURT: He's not going to have a copy.

MR. KEANE: He's got a copy, but Stinis may have it too.

THE COURT: They're supposed to pick up the bill of lading when they release the cargo.

MR. KEANE: And they get it in triplicate and they keep two.

THE COURT: So they should have a copy of it.

MR. KEANE: That's what I'm saying.

THE COURT: Well, where is their copy?

MR. KEANE: I moved on the copy they presented to me in discovery. If they want to say that that was—

THE COURT: What about on your end?

MR. KEANE: My end is the ship owner—

THE COURT: He's the ship owner, who probably should have a copy of it too.

MR. KEANE: Maybe he should but—

THE COURT: Because the captain of the vessel is the one that gets the bill of lading when he releases the cargo, not the charterer.

MR. KEANE: Well, actually, it turns out that it is the charterer. I mean—

THE COURT: The charterer goes over from Hamburg to here to wherever—

MR. KEANE: What happens is the charterer's agent issues the bills of lading. They are sent to the shipper. The shipper then presents them to the charterer's agent at the discharge port where the cargo is exchanged.

THE COURT: And who picks it up?

MR. KEANE: I'm sorry?

THE COURT: Who picks it up before the cargo is released?

MR. KEANE: The charterer—

THE COURT: An agent for the ship owner.

MR. KEANE: An agent for the charterer, not ship owner.

THE COURT: Then they should have a copy of it.

MR. KEANE: The charterer should have a copy of it, and if they were in this court, I would ask them for it but—

THE COURT: But he's not going to have a copy of it.

MR. KEANE: Sure he does. Judge, every—

THE COURT: How can he have a copy of it?

MR. KEANE: There were three copies, and the plaintiff always sues on the bill of lading. That's the basis for its—

THE COURT: I understand that.

MR. KEANE:—complaint.

THE COURT: But he's got to give the bill of lading back to the—

MR. KEANE: He has one copy. I've never had a case where the plaintiff didn't have—the shipper did not have a copy—

THE COURT: I've never had a case where the bills of lading were different.

MR. KEANE: I don't think they were, but if they were—

THE COURT: You don't think they were, but obviously they were.

MR. KEANE: We haven't seen an original bill of lading yet.

THE COURT: No?

MR. KEANE: No.

THE COURT: Why is that?

MR. KEANE: I guess the plaintiff hasn't produced them.

THE COURT: Who would have the original?

MR. KEANE: One copy will go back to the charterer, and two copies—

THE COURT: The charterer should have the original.

MR. KEANE: One.

THE COURT: The charterer should have the original.

MR. KEANE: One. Two would stay with the shipper, the original and triplicate, three originals.

THE COURT: Well, I don't know where this gets me, but it's not getting me to resolve the motion.

MR. KEANE: I'm in court on plaintiff's complaint on a bill of lading with the—

THE COURT: And I'm not persuaded that you have established a forum selection clause that both sides have agreed to.

MR. KEANE: Well, then, if I could have limited discovery, I'm sure we can get the bill of lading. It surprises me that the plaintiff can't produce it, but I'm—

THE COURT: But he has produced it.

MR. KEANE: Well, which one is it because that's the one we—

THE COURT: He's the one that's given you both, haven't you, or am I misunderstanding something?

MR. KEANE: He's given me two nonnegotiable types, and I have yet to see the original—

THE COURT: Well, I would assume they're both nonnegotiable because once he gets the cargo—you're not supposed to have a—

MR. KEANE: He should have two—

THE COURT: Otherwise, he—

MR. KEANE: He should have received three original negotiable bills of lading. He should have presented one, at which point the other two became void. He should have those other two. He should be able to produce them to us. His complaint is based on that. We're entitled—

THE COURT: And you should be able to get one, too, for the charterer over in—

MR. KEANE: They're not here, not part of the lawsuit and not part of our jurisdiction.

THE COURT: Well, maybe discovery needs to include them too.

MR. KEANE: I suppose we can make it as difficult as possible but—

THE COURT: That's why I say—how much is this case worth?

MR. KEANE: They say a million five.

THE COURT: All right. A million five case. How much have you already spent on motion practice?

MR. KEANE: $5,000.

THE COURT: How much do you expect to spend before we finish with discovery?

MR. KEANE: Well, if I can have the limited discovery I want, about $300, and then I can—

THE COURT: Oh, come on now.

MR. KEANE: Judge—

THE COURT: Is it that bad in the admiralty business for you that you're scraping around so much for work that you're going to go through this massive litigation over a million dollar claim? Come on.

MR. KEANE: If you take taxis, you'll see me tonight wearing a cap. But putting that aside, they have or should have—

THE COURT: You say $5,000. Let me ask your client for his bills.

MR. KEANE: Go ahead.

THE COURT: Both of you. I'll bet they're in excess of $5,000.

MR. KEANE: Maybe they are. I haven't checked.

THE COURT: Oh, you bet your life they are because I know when I get the pro se cases, lawyers come in here for rule 11 sanctions and a $20,000 bill for motions that are basically almost frivolous. You guys are just insulting as insane.

MR. KEANE: It's insane to my mind that the plaintiff comes into court with a bill of lading that's what his complaint—

THE COURT: But he's got you by the nose because—

MR. KEANE: That really begs the question, shouldn't he be able to produce the document that he sues under? Maybe I'm mistaken, but it seems to me that he has it and should produce it. I did move on what he did produce, but now he doesn't want to play by those rules. So I'll ask him, which ones do you want to play by? But you can't say that there were two because we all know that that's not so.

THE COURT: There were two.

MR. DALEN: Your Honor, I produced both documents. Counsel is suggesting somehow that I was making a slight of hand. I don't know what they want. I produced both documents. Their clients received one document when I filed the claim, and I gave them the other one with my production of documents.

Counsel made the motion, relying upon a particular bill of lading, when they knew there was another bill of lading out there with a Hamburg jurisdiction clause. They made the decision to make this motion to try to send the case to Cyprus. I would object—

THE COURT: Why? Because in Cyprus they can go off free. I mean, I did business in Greece before without having a lawyer. I used to have—

MR. DALEN: But they made the decision—

MR. KEANE: If this is—

MR. DALEN: Your Honor, I would object to any extension of any discovery. We have provided both bills of lading, and they've chosen to make their motion. They're asking the Court to make that decision. We have now—

THE COURT: But how is anybody going to depose any witnesses in Spain and Mexico and all the rest of it?

MR. DALEN: I'm sorry?

THE COURT: I mean, you're really pursuing this in the wrong forum. Why aren't you pursuing it in Spain or Mexico where all the witnesses are?

MR. DALEN: Your Honor, I've got the vessel here. That's why—I have the vessel in the United States.

THE COURT: How much is it going to cost you to litigate it here?

MR. DALEN: I'd rather be here.

THE COURT: He has the burden of proving inherent vice of the cargo, so I guess you're ahead of the game on that.

MR. DALEN: Your Honor, they made a motion to dismiss to enforce the jurisdiction clause. They didn't make any other motions.

THE COURT: That motion is being denied. Now the question is, where are we going from here? That's the question.

MR. DALEN: Your Honor, I'd like an opportunity to take discovery and to prove my case.

THE COURT: Well, as of now, you've got it.

MR. DALEN: In fact, I've served discovery on counsel. I've served notice of deposition. I haven't gotten any—

THE COURT: I am unable to find by a preponderance of the evidence that the forum selection clause—there is a forum selection clause that both people agree to, but I have two that have materially different terms. I don't think I have any basis to find there was an agreement as to one place or the other. In the absence of an agreement as to one place or the other, I have, in effect, no forum selection clause that I can enforce. That being so, the case stays here.

MR. DALEN: Thank you very much, your Honor.

MR. KEANE: Your Honor, will we have leave to move again if we produce evidence as to what the true bill of lading was? Because it seems to me a bit much that the plaintiff produced—he only produced one in this document discovery, one bill of lading. We moved on that, and that somehow—

THE COURT: Why do you object to litigating it here?

MR. KEANE: I don't object to litigating—

THE COURT: I'm going to have to apply Hamburg law anyway if that's the—

MR. KEANE: Judge, I wish every case in the maritime world were here, but my client has a different view. He views himself to having agreed to a different jurisdiction, and we would like to enforce that agreement. If we can have discovery and—

THE COURT: When your client finds out he's not going to Greece, he may have a somewhat different view about going to Germany.

MR. KEANE: I don't think he does.

THE COURT: Well, have you talked to him?

MR. KEANE: I have.

THE COURT: Are you going to tell him I'm going to deny his motion?

MR. KEANE: I'm going to tell him, and he will say that he's very surprised.

THE COURT: Well, I'm sure he'll be surprised.

MR. KEANE: As am I, but once we figure out what the true bill of lading is and that mystery—

THE COURT: I'm willing to have a hearing on it, if and when I get evidence, but right now I don't have any evidence.

MR. KEANE: I would suggest we have limited discovery on the true bill of lading, and we can revisit the issue—

THE COURT: But what kind of discovery can I possibly have? What witnesses will I hear?

MR. KEANE: The plaintiff who presented the bill of lading to the ocean carrier or the charterer's agent.

THE COURT: And the charterer.

MR. KEANE: If we can get them, but Germany—

THE COURT: If you can't get them, the whole thing is a waste of time, isn't it?

MR. KEANE: No. The plaintiff knows. The plaintiff had the bill of lading and presented it.

THE COURT: Are you able to explain why there are two different bills of lading? I'm asking the plaintiff.

MR. KEANE: Am I?

THE COURT: No. The plaintiff.

MR. DALEN: Your Honor—

THE COURT: Do you have any witnesses who can explain that there were two bills and that you knew there were two bills?

MR. DALEN: Your Honor, I think that information lies with the carrier and the vessel owner. We just received documents. That's all we did. We didn't create those documents. They did. And—

THE COURT: You say both of those documents you have, you received from them?

MR. DALEN: I'm sorry?

THE COURT: You say that both bills of lading that you have, you received from them?

MR. DALEN: Yes. Oh, eventually I received it from them, yes. My clients received it from them.

MR. KEANE: We'd like discovery on what that client did receive in fact—

THE COURT: We know what he got. He just stipulated to that. That's not going to explain how there were two of them.

MR. KEANE: I would like to know what bill of lading was received at the time the shipment was placed aboard the vessel and what bill of lading was used to collect the cargo at the discharge port, a simple question, and I will guarantee there was one bill of lading, three originals and one bill, that the other is a complete red her-

ring and that somebody on the plaintiff's side—

THE COURT: There are two sides to that.

MR. KEANE: Two sides to what?

THE COURT: There's his side and there's your side.

MR. KEANE: I know that, but I know how shipping works, and so do they. And there were not two separate original sets of bills of lading floating around. It doesn't happen.

THE COURT: But apparently, it did.

MR. KEANE: Well, if we could have discovery, I think I'm confident—

THE COURT: But who am I going to discover?

MR. KEANE: The plaintiff who received the bill of lading from the ocean carrier in exchange for delivery of his cargo to the ocean carrier and presented that same—

THE COURT: The plaintiff who received it in Spain?

MR. KEANE: He received it in Mexico—

THE COURT: He goes from Spain to Mexico or Mexico to Spain?

MR. KEANE: Mexico to Spain.

THE COURT: So the goods arrived in Spain?

MR. KEANE: Yes.

THE COURT: That's what I thought.

MR. KEANE: In Mexico someone working for plaintiff received three original bills of lading. When the cargo got to Spain, someone working for the—who had received those three original bills of lading and then presented the same document, one of the three original bills of lading to the charterer's agent in Spain in order to collect the cargo. That's how it works.

That bill of lading number had to match the ship's manifest and all the other paperwork, including the importation documentation required in Spain, the export documents required in Mexico. One bill of lading, three originals, not two bills of lading, six originals. If that's—

THE COURT: They were surrendered to the charterer?

MR. KEANE: The charterer, that's right. And the charterer—

THE COURT: So he's the one that has it.

MR. KEANE: What?

THE COURT: He's the one that has it.

MR. KEANE: One of the three originals would have been—the other two would have remained with the shipper and sits in his files somewhere.

THE COURT: Well, do you have any other bills of lading other than what you've produced?

MR. KEANE: I don't have any.

THE COURT: I'm talking about the plaintiffs.

MR. KEANE: Where are the originals?

THE COURT: Does your client have any bills of lading?

MR. DALEN: Your Honor, the copies of the bills of lading that I have, I have given to either counsel or his—

THE COURT: He can answer that in interrogatories. Send him an interrogatory and he'll answer.

MR. DALEN: What I don't understand is these bills of lading were surrendered when the cargo was picked up in Spain. I don't understand how come they don't have them.

THE COURT: Well, that's what I don't understand either.

MR. KEANE: What I don't understand, is the plaintiff really standing here and saying they presented two bills of lading?

THE COURT: Maybe the plaintiff is saying to you in English, I think, that he has told you already which documents he got and which he has.

MR. KEANE: His attorney is telling me that.

THE COURT: Right, but if you want it in the form of an interrogatory signed by the plaintiff, I will give that to you.

MR. KEANE: Okay.

THE COURT: That's the only discovery he can give you.

Now, the second part of that discovery is you have to provide evidence or information as to what the person who picked up the bill had.

MR. KEANE: That's the burden of the plaintiff in this action. I think he should—

THE COURT: If you can't get that, then discovery is a waste of time. I have his version and now yours.

MR. KEANE: Well, I will serve interrogatories on the plaintiff's interests—

THE COURT: You just have to serve him one interrogatory.

MR. KEANE: Yeah.

THE COURT: And then he can answer that. Just have your client sign it. But he can serve an interrogatory on you asking you to tell him what documents or what bill of lading the charterer received, and produce those bills.

MR. KEANE: I'm not the charterer. I can't answer that.

THE COURT: Well, then, I say discovery is a waste of time. If you can't get that information from the charterer, there's no way we can find out—

MR. KEANE: There are two players in this dance who had the original bill of lading, and there was only one of them, of the three originals, one set, the plaintiff and the charterer.

THE COURT: Right.

MR. KEANE: The plaintiff is right here.

THE COURT: And the charterer, you say, is not susceptible to discovery.

MR. KEANE: They're in Germany.

THE COURT: Well, if they're in Hamburg, what purpose is discovery going to serve? I can only get one side of the equation, not the other.

MR. KEANE: All I need is one side.

THE COURT: That's all you need, but it's not all I need. Lawyers are so egocentric, I must say. I have to know what the charterer picked up as well as what he has.

MR. KEANE: Plaintiff should be able to tell you both sides. We will inquire of—

THE COURT: Well, suppose he can. I want to know from the charterer.

MR. KEANE: We will try to find that out.

THE COURT: You take your interrogatories, if you want to, and go to Germany and cross-examine the guy in Germany.

MR. KEANE: They won't let you do it by deposition. You have to do it in writing. But—

THE COURT: Then, I'm sorry. You're staying here.

MR. KEANE: Well, I should have ample—I should have at least what the plaintiff knows about the bill of lading that it received—

THE COURT: I'm saying to you that the discovery that you request I'm perfectly willing to give you, but it's not going to serve any purpose. I've given you your discovery for them, but you're not able to provide any discovery to him, and I don't believe in one-sided discovery.

MR. KEANE: I will ask Stinis to produce what they can.

THE COURT: Well, you'd better use your best efforts on Stinis to—

MR. KEANE: I will.

THE COURT: Have them come and testify over here, if you want.

MR. KEANE: I'll—

THE COURT: If Germany won't allow depositions, have them come here.

MR. KEANE: I—

THE COURT: I'm sure the ship owner has—with his charterer, since he's his agent anyway. Have him come here. That's meaningful discovery. The discovery you're requesting is not meaningful at all. It's just one-sided.

MR. KEANE: I understand what you're saying, Judge. I have to say I have trouble accepting that the party who received the bill of lading in exchange for the cargo and then surrendered the bill of lading in order to pick up the cargo, and has two originals, no doubt, in his files, has no relevant information—

THE COURT: I also want to know what the person who received the bill has in his files because that makes us—that makes sense to me.

MR. KEANE: I would like to have the agents in Mexico and Spain—

THE COURT: I want to see if there's one bill that's all alike or whether these bills are—if somebody is so sloppy here, that they don't issue bills of lading in triplicate or quadruplicate and they just make them up as they go along, you know, that's not the way to do business.

MR. KEANE: That's terrible if it happened, but I don't think it did. I think there's a copy floating around. You can get—

THE COURT: I've got your theory as to how it happened, but I have no proof.

MR. KEANE: Well, the proof you have, if you look under—will be the affidavit which has the bill of lading attached to it,

production of documents from the plaintiff and the pleadings, all of which point to a bill of lading, and frankly, inny minny miny moe will satisfy me. You can choose any one you want. They all take us out of here.

THE COURT: And who inspected the cargo on arrival?

MR. KEANE: A dozen people.

THE COURT: All are located in Spain?

MR. KEANE: Yes.

THE COURT: How are you going to get them to go to Hamburg or Greece?

MR. KEANE: It's a lot closer than New York.

THE COURT: Yeah, but they're not within the jurisdiction of those countries.

MR. KEANE: No, but they're all EC countries. They probably share discovery devices, unlike the U.S.

THE COURT: I don't know. You're free to do discovery, at the most.

MR. KEANE: Well, we do, but they're there, and if they have walls up—for example, Germany, I know from another case with you, has a very rigid approach to U.S. discovery.

THE COURT: They might be amenable to pursuing you in Spain.

MR. KEANE: I don't know.

THE COURT: Because this is going to be very expensive litigation over here.

MR. KEANE: That's why we want it to be moved.

THE COURT: I understand that, but moving it to Hamburg or Greece is not going to solve the problem. It's just as expensive there as it is here, especially if you have to get witnesses from Mexico to prove inherent vice of the cargo.

MR. KEANE: It's not a perfect—

THE COURT: This is, what, water damage to glass?

MR. KEANE: Yes, supposedly.

THE COURT: It's not going to be an inherent vice case, very likely. Is it sea-water?

MR. KEANE: They say.

THE COURT: Where was it stored on the ship?

MR. KEANE: Under deck.

THE COURT: Well, it sounds like he's going to have a pretty good case under liability here.

MR. KEANE: We think we have seawater or adverse—

THE COURT: But why would water damage glass so much?

MR. KEANE: I don't know. It's the first time I've ever seen it. I've heard of it and they say it's true, but we think—

THE COURT: What kind of glass was this?

MR. KEANE: Apparently, some—well, you probably know better.

THE COURT: What kind of glass was this?

MR. DALEN: Your Honor, the cargo was loaded on clean bills of lading, and when it was inspected in Spain, they found saltwater in there. And there was evidence of drip-down patterns from the hatch covers.

THE COURT: I know, but why does saltwater cause such damage to glass, which could have been washed, I assume?

MR. DALEN: I'm sorry? I'm wearing hearing aids.

THE COURT: No. I'm saying saltwater, it should be something relatively easy to remove from glass.

MR. DALEN: The problem is these were pieces of glass, one against the other. Capillary action, the water filters in, and it

stains the glass. When the trial comes along—

THE COURT: Is it dishware or—

MR. DALEN: Apparently, saltwater stains and etches glass.

THE COURT: What kind of glassware was it?

MR. DALEN: I'm no expert.

MR. KEANE: They were giant sheets. They weren't—

MR. DALEN: These are what they call end caps. And they're huge pieces of glass sticking one against the other, and they're affixed at the edges with metal bracing.

THE COURT: What purpose are they used for, to build or make windows or what?

MR. DALEN: I believe this is used in construction.

THE COURT: Construction. So, I take it, that cargo was a total loss, or were they able to get rid of some of it?

MR. DALEN: They were able to salvage some of it but not very much.

THE COURT: Well, it's not the kind of thing that's going to usually be susceptible of having an inherent vice in the cargo, unlike—

MR. DALEN: Well, it's not an inherent vice. Quite frankly, if you have glass in your house, you would expect the glass wouldn't get stained, but over time, it gets etched. It gets—the glass loses its clarity because of the water.

In this instance here, I'm informed that because of the saltwater getting between the pieces of glass, I mean, the capillary action, and remaining like that, it did stain the glass.

THE COURT: But this litigation is going to be astronomical. You're going to have to get crew members.

MR. DALEN: Yes.

THE COURT: You're going to have to get the people who inspected the cargo. You're going to have to get the people who loaded it in Mexico.

MR. DALEN: We've already produced all the documentation on that point to the—

THE COURT: I know, but you're going to need witnesses too. It's going to be a very expensive litigation.

MR. DALEN: I'd love to settle the case, your Honor.

THE COURT: They could be in Greece or Hamburg. They could be anywhere, but it's going to be expensive to bring these witnesses from all over the place.

MR. DALEN: Well, the witnesses would probably come from Spain and Mexico. That's correct.

THE COURT: There are quite a few of them.

MR. DALEN: Yes.

THE COURT: And even if you try this case here, you've got to do it here and get them here.

MR. DALEN: My client is prepared to come to New York, your Honor.

THE COURT: Huh?

MR. DALEN: My client is prepared to come to New York.

THE COURT: All right. Well—

MR. DALEN: Your Honor, if I may.

THE COURT: —it's still going to be expensive.

MR. DALEN: At your first conference, which I did not attend, you indicated that discovery would proceed under normal—normally. I just want to make it clear because I've served discovery upon the defendants, and I haven't received anything. I've also served notice of deposi-

tion. I'm prepared to take the testimony of the master and the chief mate.

THE COURT: Are they here, or where are they?

MR. DALEN: Well, we're prepared to travel to Cyprus. We were informed that they would be made available in Cyprus.

THE COURT: Well, go ahead.

MR. DALEN: Okay. I just want to make sure that we'll continue with discovery.

THE COURT: I haven't stayed discovery.

MR. DALEN: Okay. Thank you very much, your Honor.

THE COURT: It just seems to me that this is a case that if you're going to settle it, I would try to settle it at the earliest possible stage rather than putting $500,000 into it and trying to settle it.

MR. DALEN: Your Honor, I'm prepared to settle it in the meantime. I'm willing to meet with counsel and try to settle the case.

MR. KEANE: Just for the record, we did not agree to make the master chief officer available in Cyprus.

MR. DALEN: I believe I have a letter from you saying that their testimony would be made available in Cyprus.

MR. KEANE: Well, if you have that letter, then I stand corrected.

THE COURT: All I'm saying to you is that—look, let's face it, there's two ways to settle the case. One, you pay the plaintiff. Two, you pay the lawyers. I mean, the lawyers have a certain interest in being paid, but from the standpoint of the client, you know, litigation is costly. And I don't get into settlement in a case which may be nonjury, and this case is nonjury, so I won't get into the merits. So I will only discuss settlement to the extent that we're talking about a business settlement—

MR. DALEN: That's correct.

THE COURT: —one that's based upon considerations other than the merits of the case, which is whether it's worth litigating and how much you can reasonably expect to get. And I think the earlier you get into those discussions the better because once you start spending four or five hundred thousand dollars on litigation, you know, then, of course, the clients say, hey, I've already paid the $500,000, but then the problem is he's still liable for the million. He loses. So what's the point?

This doesn't seem to be a big enough case that it's worth all this effort, and it seems to me we have witnesses coming from a lot of difficult places, whether the case is tried here in Spain, Hamburg or anywhere else, except in Greece, maybe, where they will get out on a motion, which is why they want to go there.

But, look, I'm available to discuss settlement with you only on a business basis. If you want to discuss the merits, I'll send you to another judge or a magistrate, but I won't do it, as long as I'm the fact finder. All right?

In the meantime, I'll give you another conference in 90 days. Let me know where you are. Okay?

MR. DALEN: That will be fine, your Honor.

THE COURT: If you have another motion you want to file, you can file it, but I'm telling you the problem I have is I can't tell what the contract is. If I can't tell what the contract is, how can I enforce the contract?

MR. KEANE: Well, we won't burden the Court unless that's clear.

THE COURT: I don't think it means— if he were making a motion to go to Germany, he'd have a hard job, if that was his burden, to show the preponderance of the evidence in favor of a forum selection clause.

Same problem with you. This is one of those classic cases where the scales are in equilibrium; and, therefore, you can't find for either side. This is the first case I've seen in 25 years like this where I've had a bill of lading where the parties are arguing about what the terms are. I usually get one bill of lading, and it's clear. This is not that kind of case.

And, as we say, you stay here long enough, you get every kind of case. All right. This is one for the books. I'm sure it's one for the books for you too.

MR. KEANE: Absolutely.

THE COURT: Have you ever had a case like this?

MR. KEANE: Never have. I haven't seen it.

THE COURT: I've never seen one like this here.

MR. WOLFSON: If I may, your Honor, it's a two-sided document. Once we get to see plaintiff's two originals, we'll determine very quickly whether they were actually different. That's all we have is copies. I think the wrong terms were affixed to the wrong bill. If I see those two-sided documents and they contain different terms—

THE COURT: But it's the backside that's different.

MR. WOLFSON: Those are documents that should be—

MR. DALEN: There are two different backsides here, your Honor, and there are two different dates in the bill of lading.

THE COURT: Well, we all know that the difference in backsides can make a difference.

Have a good day.

October 31, 2011

*BY HAND*

Hon. Loretta A. Preska, Chief Judge

United States Courthouse

Southern District of New York

500 Pearl Street

New York, New York 10007

RE: USDC/SDNY 05 CV 5887(LAP)

AIG MEXICO SEGUROS INTERAMERICANA

S.A. de C.V. v. M/V ZAPOTECA, her engines, etc. *in rem;* ZAPOTECA

SHIPPING CO. LTD. and INTERORIENT

NAVIGATION CO. LTD., *in personam*

Our File No.:19/3183/B/05/6

Honorable Madam,

We write pursuant to direction from the Court at the Pre-trial Conference held on Oct. 28, 2011; specifically to address defendants' that the matter should be dismissed pursuant to a forum clause in the contract between the parties, i.e. the original accomplished original signed bill of lading.

The first issue, and the only one presently addressed, is whether that issue is barred by a prior ruling by Hon. John E. Sprizzo. We failed to find the appropriate Docket entry at the PTC but now attach the Order recorded at Entry 15 on the Docket Sheet denying a contract foreign motion *without prejudice.* (Ex. 1.) The motion was treated in that manner in view of a question of fact which had been raised by plaintiff as what bill of lading controlled the cargo move. Subsequently, we made another contract forum motion on limited discovery; however upon discussion with the Court it was *withdrawn.*

We attach that order, Docket entry 16, as well. It also does not bar raising the forum contract clause after discovery was completed. (Ex. 2.) In order to satisfy the Court's question on the proof issue concerning the defense that the action is in an impermissible forum we needed to com-

plete all discovery and raise the defense at trial.

Having reached that position, we believe the evidence is clear that only one bill of lading was issued and negotiated to the consignee. That bill of lading, in accord with worldwide commerce was a *signed* *"original"* bill of lading, in sharp contrast to the non-negotiable unsigned copies used to muddle the issue of what contract controlled the cargo move. That original bill of lading contains a signed endorsement by the consignee on its reverse, demonstrating it was the document used to assert title and dominion over the cargo at its destination. It is the same bill of lading, in copy, which is found in several expert reports, and is referred to by witnesses for both the shipper and consignee as the "bill of lading" involved in the subject shipment. It is also clear the original bill of lading is the controlling contract as understood by plaintiff.

Unfortunately, none of the witnesses who testified for plaintiff had any first hand involvement with the bill of lading, but the endorsement and the attached excerpts of testimony, with exhibits, leave no room for doubt what the contract of carriage was. But if any existed the original bill of lading expressly states on its face:

> "IN WITNESS WHEREOF the number of original Bills of Lading stated above all of this tenor and date have been signed, one of which being accomplished the others to stand void."

Thus, had there been any confusion, once the signed original bill of lading with endorsement was "accomplished" there could legitimately be no doubt what the contract as issue was. That contract calls for all disputes to be heard in the carrier's principal place of business. Such clauses have been routinely affirmed as valid.

The person presented by plaintiff with "the most knowledge about the bills of lading" was Ms. Sofia Edith Sosa, who at the time relevant was the "head officer of customers of exports". (Ex. 3. Transcript, P. 7; L 11–12). She testified that the original bill of lading was necessary for the shipment; identified as Ex. 8, if a letter of credit was involved, but not the non-negotiable copy. (*Id.* at 28, L. 24–25; 29 1–7) (Original B/L; attached hereto as Ex. 4). She testified she did receive three original bills of lading for the subject shipment, but was uncertain as to non-negotiable copies. (Id. at 25, L. 20–25; 30, L. 1–3). Similarly, Ms. Sosa did not read the backs of the original or non-negotiable bills of lading (*Id.* at p. 24, l. 1–10). While not certain what she provided her credit and collection department, she was certain the original bills of lading would have been provided. (Id. at 31, L. 22–25 and 32 L. 1–7) Ultimately, the original bill of lading was identified as the bill of lading for the cargo transported on the Zapoteca. (id. at 33 L. 11–17).

One of plaintiff's experts, Estanislao Mallo, who attended shortly after the vessel reached the discharge port while working for BSI Surveyors, appended to his report a copy of the "original bill of lading" his investigation developed. It was received from the purported surveyors for the charterer, which charterer or its agents, would, in the normal course of events, have collected the endorsed original bill of lading against surrender of the cargo to the consignee. We attach as Ex. 5 the bill of lading and relevant transcript pages from the Mallo deposition.

Similarly, a surveyor for the Owner's interests, Juan Carlos Cuesta, at the discharge port attached another copy of the "original bill of lading" investigation developed. His testimony concerning same is attached with the original bill of lading as Ex. 6.

Plaintiffs person in charge of the operation of all plants in Spain, including logistics and transportation, when the cargo

was delivered there, was Baldomero Gardea, Ex. 7, is a portion of his Deposition Transcript at page 10, l. 3–10. He did not have the file on the cargo at issue to aid his testimony, (*Id.* 17–18). But he did state in response to this question at p. 15, l. 18–24:

Q. "Was it the procedure that an original bill of lading would have to be presented, to the vessel of the terminal where the cargo was discharged, in order for Cristal Glass to collect the cargo?"

A. The Interpreter: "I am not sure. <u>It must be,</u> but I'm not sure" (emphasis added)

But, of course, that is the way it works around the world, whether the head of logistics and transportation for the plaintiff recalled the specific facts, plainly, he was right "it must be".

No witness for the plaintiff testified there was any confusion over which document was the actual bill of lading under which the cargo moved.

For those reasons, defendant urges that it be allowed to pursue the discussed defense at or before trial.

Respectfully Submitted,

MAHONEY & KEANE, LLP

By: Edward A. Keane

468

# *Exhibit "1"*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X

AIG MEXICO SEGUROS INTERAMERICANA,
S.A. de C.V.,

 Plaintiff,

 - against -

M/V ZAPOTECA, her engines, tackle,
boiler, etc., *in rem;* ZAPOTECA
SHIPPING CO. LTD. and INTERORIENT
NAVIGATION CO. LTD., *in personam,*

 Defendant(s).

-------------------------------------------X

05 Civ. 5887 (JES)

**ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/9/06

 The above-captioned action having come before the Court, and defendants having submitted their Motion to Dismiss dated November 21, 2005, and plaintiff having submitted an Opposition to such Motion dated December 19, 2005, and counsel to all parties having appeared before the Court for Oral Argument on March 3, 2006, and the Court having considered all matters raised, it is

 **ORDERED** that, for the reasons stated on the record at the aforementioned Oral Argument, defendants' Motion to Dismiss shall be and hereby is denied without prejudice; and it is further

 **ORDERED** that a Pre-Trial Conference shall occur on June 12 2006 at 3:00 p.m. in Courtroom 705, 40 Centre Street.

Dated: New York, New York
 March 6, 2006

 John E. Sprizzo
 United States District Judge

# *Exhibit "2"*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------X

AIG MEXICO SEGUROS INTERAMERICANA,
S.A. de C.V.,

 Plaintiff,

 - against -

M/V ZAPOTECA, her engines, tackle,
boiler, etc., *in rem;* ZAPOTECA
SHIPPING CO, LTD, and INTERORIENT
NAVIGATION CO, LTD., *in personam,*

 Defendant(s),

-----------------------------------------------X

05 Civ. 5887 (JES)

ORDER

 Counsel to all parties in the above-captioned action having appeared before the Court for a Pre-Motion Conference on May 1, 2006, and defendants having sought leave of the Court to submit a Motion to Dismiss for Forum Non Conveniens, and the Court having considered all matters raised, it is

 **ORDERED** that, as discussed at the aforementioned Conference, defendants' Motion to Dismiss for Improper Venue, shall be and hereby is withdrawn; and it is further

 **ORDERED** that, as discussed at the aforementioned Conference, defendants shall be and hereby are granted leave to submit their Motion to Dismiss for Forum Non Conveniens, not to exceed twenty-five (25) pages, on or before June 1, 2006; and it is further

 **ORDERED** that plaintiff shall submit its Response to defendants' Motion, not to exceed twenty-five (25) pages, on or before July 5, 2006; and it is further

 **ORDERED** that Oral Argument shall occur on July 25, 2006 at 3:00 p.m. in Courtroom 21C, 500 Pearl Street.

Dated: New York, New York

 May , 2006

 John E. Sprizzo
 United States District Judge

# *Exhibit "3"*

Transcript of the Testimony of:

## Sofia Edith Sosa

**Date:** July 25, 2007

**Case:** AIG Mexico Seguros, Interamericana S.A. de C.V. v. M/V ZAPOTECA, et al.
05CV 5887 (JES)

*Tom Crites & Associates International, Inc.*
*P.O. Box 9438*
*Savannah, Georgia 31412*
*Phone: 800-631-3480*
*Fax: 912-233-7777*
*critesreporting@aol.com*
*www.critesintl.com*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AIG MEXICO SEGUROS,
INTERAMERICANA S.A.
DE C.V.,

 Plaintiff,

vs CASE NO: 05CV 5887(JES)

M/V "ZAPOTECA", her
engines, tackle, boilers,
etc., in rem; ZAPOTECA
SHIPPING CO., LTD., and
INTERORIENT NAVIGATION CO.,
LTD., in personam.

 Defendants.

 The deposition of SOFIA EDITH SOSA, taken by counsel for the Defendants, pursuant to notice and agreement of counsel, before Kathleen Dore, Certified Court Reporter, at the Vitro Offices, Monterrey, Mexico, July, 25, 2007, at 3:10 p.m.

**472**

Sofia Edith Sosa
AIG Mexico Seguros, Interamericana S.A. de C.V. v. M/V ZAPOTECA, et al.

July 25, 2007

2 (Pages 2 to 5)

Page 2

APPEARANCE OF COUNSEL:

FOR THE PLAINTIFF:

KEITH B. DALEN, ESQUIRE
Hill, Rivkins & Hayden, LLP
45 Broadway, Suite 1500
New York, New York 10005

FOR THE DEFENDANTS:

EDWARD A. KEANE, ESQUIRE
Mahoney & Keane, LLP
111 Broadway, 10th Floor
New York, New York 10006

ALSO PRESENT: JAVIER ARECHAVALETA SANTOS, DIRECTOR JURIDICO - VITRO

AIDE PARRA IBARRARAN, INTERPRETER
GERENTE GENERAL
Av. Division del Norte No. 2655
Int. 3 Col. Del Carmen Coyacan
Mexico City, Mexico

Page 3

I N D E X

EXAMINATION
 By Mr. Keane ———————— 4
 By Mr. Dalen ———————— 30
 By Mr. Keane ———————— 31
 By Mr. Dalen ———————— 33

ATTESTATION ———————— 34
ERRATA SHEET ———————— 35
CERTIFICATE ———————— 36

D O C U M E N T A R Y E V I D E N C E
NUMBER DESCRIPTION PAGE
8 The original Bill of Lading 29

Page 4

KEANE - SOSA

(THE REPORTER: I am appearing here today on behalf of my employer, Tom Crites & Associates. My office was requested by Mr. Keane's office to provide a court reporter today at 3:00 p.m. at this address.

Pursuant to the instructions of my employer, I wish to disclose that, other than accepting to serve as your reporter, we have not entered into any other contractual agreement with any party involved in this case.)

AIDE PARRA, having been first duly sworn to accurately interpret from English to Spanish, and Spanish to English, the questions of counsel and responses of the witness, testified as follows:

SOFIA EDITH SOSA, having been produced and first duly sworn, as a witness, testified as follows:

EXAMINATION

BY MR. KEANE:

Q Good afternoon. Would you state your name for the record, please?

A Sophia Edith Juarez Sosa.

Page 5

KEANE - SOSA

Q Ma'am, my name is Ed Keane, and I'm an attorney involved in litigation concerning the M/V Zapoteca.

It's my opportunity to ask you some questions. And when I do that, and whatever response you may give, this woman is going to record that with that machine. That record may be read by the judge. So, you should take it with the same seriousness you would in giving answers to whatever questions I pose, as if you were open court in front of the judge. All right.

If you don't understand a question, please let me know and I'll rephrase it. If you don't know the answer, that's fine. You can tell me that.

If you need to take a break, for whatever, let me know that. All right. By whom are you presently employed?

THE INTERPRETER: Vitro Plano De Mexico.

Q And how long have you been employed by Vitro?

A Seven and a half years.

Q In what capacity are you presently employed?

473

Sofia Edith Sosa
AIG Mexco Seguros. Interamericana S.A. de C.V. v. MV ZAPOTECA. et al.

July 25, 2007

3 (Pages 6 to 9)

Page 6

KEANE - SOSA

THE INTERPRETER: Purchase.

Q Of any particular type of product?

THE INTERPRETER: Finished product.

Q And how long have you had that position?

THE INTERPRETER: Five months.

Q And before that, what position did you hold?

THE INTERPRETER: The head of services for customers of exports.

Q And how long were you in that position?

THE INTERPRETER: Four years.

Q And before that?

THE INTERPRETER: Consultant of customer service for exports.

Q And how many years were you in that position?

A Two and a half years.

Q Does that cover your employment history with Vitro?

THE INTERPRETER: Yes, that's it.

Q And before that, by whom were you employed?

THE INTERPRETER: That's my first job.

Q What was the highest level of education

Page 7

KEANE - SOSA

you reached?

THE INTERPRETER: Major -- I mean university.

Q University?

THE INTERPRETER: Yes.

Q What was your major at university?

THE INTERPRETER: Management.

Q In June of 2004, what position did you hold?

THE INTERPRETER: The head officer of customers of exports.

Q And what were your duties, in that position?

THE INTERPRETER: Supervise -- supervising the paperwork and logistics.

Q Of export shipments of Vitro?

THE INTERPRETER: That's it.

Q In that capacity, were you familiar with bills of lading for ocean carriage of cargo?

THE INTERPRETER: Yes.

Q Was that something you dealt with on a daily basis, or a weekly basis, or a monthly basis?

THE INTERPRETER: I did it weekly.

Q Did Vitro have weekly shipments of cargo

Page 8

KEANE - SOSA

by ocean in 2004?

THE INTERPRETER: Not every week.

Q Did you see bills of lading for transportation, other than by ocean?

THE INTERPRETER: Yes.

Q How often did you get involved with bills of lading, for ocean carriage of cargo, for Vitro?

THE INTERPRETER: Every week.

Q Every week, okay. Did you deal with bills of lading issued by or having the name H. Stinnes Linien on it in 2004?

THE INTERPRETER: Yes.

Q First of all, did you look at any documents before coming here today to testify?

THE INTERPRETER: No.

Q What's your recollection of dealing with bills of lading with the name H. Stinnes Linien on it?

THE INTERPRETER: I'm not sure. I think I started looking at them in 2002 or 2003.

Q Okay. Whichever year, why did you start looking at bills of lading with that name on it?

THE INTERPRETER: Can you repeat?

(Whereupon, the following was

Page 9

KEANE - SOSA

read back:

"Q What's your recollection of dealing with bills of lading with the name H. Stinnes Linien on it?

THE INTERPRETER: I'm not sure. I think I started looking at them in 2002 or 2003.

Q Okay. Whichever year, why did you start looking at bills of lading with that name on it?"

THE INTERPRETER: It was the company that was hired and recommended by the supplies and logistics departments.

Q Okay. To do what?

THE INTERPRETER: The shipments of loose cargo to Spain, which was Cristal Glass in that moment.

Q Was that loose cargo shipped in what were called end caps?

THE INTERPRETER: Yes.

Q And in whatever the first year was, you started dealing with Stinnes for that transportation, how many shipments did you have approximately?

THE INTERPRETER: I'm not sure. It was

**474**

Sofia Edith Sosa
AIG Mexico Seguros. Interamericana S.A. de C.V. v MV ZAPOTECA, et al.

July 25, 2007

4 (Pages 10 to 13)

Page 10

KEANE - SOSA

two or three shipments.

Q And I'm here, as you likely know, to discuss a shipment aboard the vessel Zapoteca. That was in June of 2004. Do you recall how many shipments, before that, were involved with Stinnes?

THE INTERPRETER: With me in that position?

Q With you in any position.

THE INTERPRETER: More than 10. I do not remember exactly.

Q Did you deal with Stinnes bills of lading in any position, other than that which you held in 2004?

THE INTERPRETER: No.

Q What was the typical arrangement, for you to come in contact, with a Stinnes bill of lading?

THE INTERPRETER: I was in direct contact with them. It was through a representative.

Q Okay. Which representative was that?

THE INTERPRETER: Ultra Transport.

Q What is the business of Ultra Transport?

THE INTERPRETER: Being the representative, of the ship or airline companies, that carries out transportation.

Page 11

KEANE - SOSA

Q Okay. Did you deal with them, in respect to transportation, other than on Stinnes vessels?

THE INTERPRETER: They were all transportation, but they were different from Stinnes.

Q But you used them, you came in contact with them for other types of transportation, other than steamship companies or ocean transportation? You came in contact with Ultra Transport for other transportation, than aboard Stinnes ships, is that correct?

THE INTERPRETER: Read back the question.

(Whereupon, the following was read back:

"Q But you used them, you came in contact with them for other types of transportation, other than steamship companies or ocean transportation? You came in contact with Ultra Transport for other transportation, than aboard Stinnes ships, is that correct?"

THE INTERPRETER: Yes.

Q Did they handle their actions, in regard to Stinnes, any differently than any other of the

Page 12

KEANE - SOSA

transportation companies they acted for?

THE INTERPRETER: Yes.

Q It was the same, or was it different, and if it was different, how did they act differently in those instances?

THE INTERPRETER: It is different because of the kind of load and it is a higher volume. And of course, the Stinnes is handling loose loads instead of having containers.

Q Did that mean there was a difference in how bills of lading were issued, or was it the same procedure as far as the issuance of bills of lading followed?

THE INTERPRETER: The bills of lading is handled the same for all of them.

Q Was there one person, at Ultra Transport, you typically dealt with, or did you deal with any number of people?

THE INTERPRETER: Several people.

Q As far as Stinnes, was it various people, or one person, you dealt with at that company?

THE INTERPRETER: I did not have any direct contact --

Q Bad question. At Ultra Transport, did you

Page 13

KEANE - SOSA

deal with one person, in regard to shipments carried by Stinnes, or did you deal with a number of people at Ultra Transport?

THE INTERPRETER: With several people.

Q What was, typically, your first involvement for shipment, by Vitro, to be carried aboard a Stinnes ship; what was the first thing that happened, as far as your involvement?

MR. DALEN: Are you talking about the first time she did anything, or are you talking about each shipment?

BY MR. KEANE:

Q Each shipment, what was your first involvement in 2004?

THE INTERPRETER: First, I asked for the itinerary of the vessels in which it was possible to send the volume that I wanted.

Q Who did you ask that of?

THE INTERPRETER: The person from Ultra Transport.

Q Okay. They would then respond with some itinerary for the next vessel or the next vessels?

THE INTERPRETER: Yes.

Q Then what would you do next?

**475**

Sofia Edith Sosa
AIG Mexico Seguros, Interamericana S.A. de C V. v. M/V ZAPOTECA, et al.

July 25, 2007

5 (Pages 14 to 17)

Page 14

KEANE - SOSA

THE INTERPRETER: Once it was decided, at the supply and logistics department, what vessel it was going to be loaded on, then this vessel was reserved.

Q How would you reserve that vessel?

THE INTERPRETER: You make a request via e-mail.

Q To Ultra Transport?

THE INTERPRETER: Yes.

Q What would you say in the e-mail to Ultra Transport?

THE INTERPRETER: Okay. It includes the name of the vessel to be reserved, the ETA, the volume in kilograms or tons that is needed, the number and type of end caps to be loaded, the number of the company that is requesting it and the customer.

Q And what would then happen after that, would you send that e-mail?

THE INTERPRETER: Me or somebody that is in charge of me -- sorry -- is under me.

Q What would, typically, be the next thing that would happen?

THE INTERPRETER: The next thing would be

Page 15

KEANE - SOSA

to confirm the reservation, and this was through the information for the bill of lading. This is the information required to fill in the bill of lading.

Q Okay. Who would you give that information to?

THE INTERPRETER: From logistics and from the customer, it has to have some information that is given by logistics to be sent to the right place.

Q Okay. Logistics within Vitro?

THE INTERPRETER: Yes.

Q And the customer we're talking about, end caps to Spain, would be Cristal Glass?

THE INTERPRETER: Yes.

Q Do you know the persons, at Cristal Glass, who would give the information needed from their end?

THE INTERPRETER: I don't remember who it was in that moment.

Q Who, from logistics, would provide the information that was needed to issue the bills of lading from Vitro?

MR. DALEN: Objection to the form of the

Page 16

KEANE - SOSA

question.

THE INTERPRETER: The logistics manager.

BY MR. KEANE:

Q And what was the name of the logistics manager in 2004?

THE INTERPRETER: It was the -- no, sorry. It was the warehouse manager. His name is Apolinar Figueroa.

Q Do you know what information he would provide?

THE INTERPRETER: The number and the type of end caps and the weight of the shipment.

Q Okay. And that information would be passed to whom?

THE INTERPRETER: To the customer's agent and to Ultra Transport.

Q And what would the next step then be?

THE INTERPRETER: Regarding the bills of lading?

Q Yes.

THE INTERPRETER: Once the shipment is done, the Ultra Transport person sends a draft of the bill of lading so it is approved.

Q Who does the Ultra Transport person send

Page 17

KEANE - SOSA

that draft of the bill of lading to?

THE INTERPRETER: Do you want the name, the specific name?

Q If you know it -- it wasn't you?

THE INTERPRETER: Ultra Transport sends it to me in a draft.

Q In reference to the Zapoteca, do you recall the person who sent you the draft bill of lading, from Ultra Transport?

THE INTERPRETER: The name of the person?

Q If you remember, fine, if you don't, you're free to tell me that as well. I know it's been a number of years.

THE INTERPRETER: I can imagine who it was, but I'm not sure.

Q Then I won't ask you to guess. And I know it's been a number of years, so all right. What would next typically be, after you get the draft bill of lading?

THE INTERPRETER: Author -- author it if it is correct, or make the corrections if necessary, and take it back to Ultra Transport.

Q Okay. If there were corrections, would they send you another draft?

Sofia Edith Sosa
AIG Mexico Seguros, Interamericana S.A. de C.V. v. M/V ZAPOTECA, et al.

July 25, 2007

6 (Pages 18 to 21)

Page 18

KEANE - SOSA

THE INTERPRETER: Yes.

Q And once the draft was approved, what would happen then?

THE INTERPRETER: Ultra Transport would send the original bill of lading and two non-negotiable copies.

Q Who would they send that to?

THE INTERPRETER: Ultra Transport -- to me.

Q And would the original or the two non-negotiable copies be signed?

THE INTERPRETER: It's not two copies, but the non-negotiable copies only, not with no specific number.

Q Okay. How many originals would be sent?

A Three.

Q And how many non-negotiable copies or copy would be sent?

THE INTERPRETER: Three or more.

Q Okay. Would any of those be signed, at the time you received them?

THE INTERPRETER: Yes.

Q Who would they be signed by?

THE INTERPRETER: I am not sure.

Page 19

KEANE - SOSA

Q Was it your understanding that the cargo would have already been onboard the ship, at that time you received the signed, original bill of lading?

THE INTERPRETER: The vessel has already left, when the bill of lading arrives.

Q When you approve the draft bill of lading, in order to allow an original to be issued, is the cargo aboard or still yet to be loaded?

THE INTERPRETER: It is aboard and it has already left.

Q Let me try to clarify. Before an original bill of lading is issued, you have drafts that are presented.

You either approve or ask for some changes. And finally there's one you say, this is good. Right at that time, where is the cargo at that point. where is the cargo?

THE INTERPRETER: It has already left on the vessel. When the first draft is received, the cargo has already left.

Q I see. And how do you know that?

THE INTERPRETER: Because information from the draft has to be compared, and this is compared

Page 20

KEANE - SOSA

to the invoice.

Based on the information that logistics sends, which is when the cargo is already on the vessel and they are just closing or they have already left the port, and all this process takes like one or two days, that's why the cargo leaves, and then I get the original.

Q Okay. But it's your understanding the vessel's already left, with the cargo, while you're still looking at the draft bill of lading?

THE INTERPRETER: Yes.

Q How do you know it's draft bills of lading?

THE INTERPRETER: The type of paper in which it is printed is not like the final version. It does not have the legend of original or non-negotiable copy.

Q Do you save those drafts in your file?

THE INTERPRETER: Yes, I do.

Q Do you recall, in reference to the Zapoteca shipment in June 2004, and unless I say otherwise I don't know if you had other shipments on the Zapoteca, but I'm referring to the June 2004 shipment of end caps; do you recall if there was a

Page 21

KEANE - SOSA

draft bill of lading presented to you, and if so whether -- how many drafts were presented to you?

THE INTERPRETER: I don't remember.

Q Was the procedure we've discussed followed, in reference to the Zapoteca, as best you can recall as far as getting issuance of bills of lading?

In other words, the information was presented to you the same way you've described from logistics and the customer.

You passed it on to Ultra Transport. Ultra Transport prepared draft bills of lading that Ultra sent to you for approval.

If I captured it right, that would be the process. Is that the best you can recollect of what happened with the Zapoteca?

THE INTERPRETER: Yes, as far as I remember, yes.

Q As far as you remember, at least up to that point, the Zapoteca was typical from your perspective?

THE INTERPRETER: It was a completely normal perspective.

Q Did there come a time when you received

477

Sofia Edith Sosa July 25, 2007
AIG Mexico Seguros, Interamericana S.A. de C.V. v. M/V ZAPOTECA, et al.

7 (Pages 22 to 25)

## Page 22

KEANE - SOSA

original bills of lading, and one -- let me start again.

Did there come a time when you received the original bill of lading in triplicate, concerning the Zapoteca cargo?

THE INTERPRETER: Correct.

Q And in Exhibit 1 we've marked, it's five pages, but the second page -- the fourth page is a xerox copy of the bills of lading which says, original. Does that appear to be the copy, of the original bill of lading, issued for the Zapoteca?

THE INTERPRETER: Yes.

Q And you see it has a signature. Do you recognize that signature? Actually, it has two signatures. I stand corrected. Do you recognize either of those two signatures?

THE INTERPRETER: No.

Q Okay. And you would have received that in triplicate, is that correct?

THE INTERPRETER: Yes.

Q What would you have done with the triplicate of the original bill of lading?

THE INTERPRETER: I attached it to the other documents for the shipment, and then I take

## Page 23

KEANE - SOSA

it to the credit and collection department.

Q Do you know what they do with it after that?

THE INTERPRETER: They send it to a bank so it is sent to the customer.

Q In this case being Cristal Glass?

A Yes.

Q Do they send all three original bills of lading?

THE INTERPRETER: Yes.

Q Does there come a time when one or more of the original bills of lading are returned to Vitro?

THE INTERPRETER: Not as far as I know.

Q What other documents, besides the triplicate original bill of lading, do you put together in order to present it to the credit and collection department?

THE INTERPRETER: The invoice, the packing list, the bills of lading. I think those are all in the case of space, because for each customer it is different.

Q But as far as Cristal Glass being the customer, those are the documents you put together to present to the credit and collection department?

## Page 24

KEANE - SOSA

THE INTERPRETER: Yes.

Q All right. Do you concern yourself with whether the original bill of lading has a front and back, correct, and the backs have got a lot of conditions of carriage; do you concern yourself with those conditions of carriage?

THE INTERPRETER: I receive it with the bill of lading, but I do not read them or check them or anything.

Q All right. You don't retain -- the original bill of lading comes in three different -- three original forms. Are they different colored?

THE INTERPRETER: The three of them are the same.

Q The same. And you retain them for Vitro and you send them along to the customer?

THE INTERPRETER: I give one non-negotiable copy or photostatic copy -- I keep. I keep, not I give.

Q Is the photostatic copy, if you keep one, the original bill of lading or the non-negotiable copy?

THE INTERPRETER: Either of them, and only the front page not the back.

## Page 25

KEANE - SOSA

Q The front page being the one that has the enlarged H. Stinnes Linien?

THE INTERPRETER: Yes.

Q Now, you also receive what's stamped as a non-negotiable copy, is that correct?

THE INTERPRETER: Yes.

Q Do you receive that on every shipment, at the same time as you receive the original bill of lading?

THE INTERPRETER: Yes.

Q Is the non-negotiable copy signed typically?

THE INTERPRETER: Not necessarily. Sometimes they do, sometimes they don't.

Q Does the non-negotiable copy come in triplicate or more than one?

THE INTERPRETER: Normally, they come by three, but sometimes there are more than three or two only.

Q In the Zapoteca shipment, in June of 2004, did you receive three originals, as best as you can recollect for your original bill of lading?

THE INTERPRETER: Yes.

Q And did you receive one or more

**478**

Sofia Edith Sosa
AIG Mexico Seguros, Interamericana S.A. de C.V. v. MV ZAPOTECA, et al.

July 25, 2007

8 (Pages 26 to 29)

Page 26

KEANE - SOSA

non-negotiable copies?

THE INTERPRETER: I'm not sure.

Q Let me show you another document which is part of Exhibit 1, just two pages as we photocopied them, and this says copy non-negotiable, and it's not signed. But it refers to the Zapoteca at the same time frame; do you recall receiving that document?

THE INTERPRETER: It is actually from the Zapoteca.

Q Do you recall if you received one of those non-negotiable copies or more?

THE INTERPRETER: I don't remember how many.

Q You received them both, the non-negotiable copy and the original, at the same time?

THE INTERPRETER: Yes.

Q And that was typically the way it worked; you would get both the non-negotiable and the original at the same time?

THE INTERPRETER: Yes.

Q And Ultra Transport would have sent those to you?

THE INTERPRETER: Yes.

Page 27

KEANE - SOSA

Q Directly to you, not to logistics or anyone else?

THE INTERPRETER: It's to me or it's to somebody under my charge.

Q Okay. Do you have an understanding, as to -- as between the original and the copy non-negotiable, which is the contract between Vitro and the ship?

MR. DALEN: Objection to the form of the question. You're asking for a legal conclusion.

BY MR. KEANE:

Q I'm asking for her --

THE INTERPRETER: No, I don't know.

Q Once you receive the original or non-negotiable copy, did you show it to anyone else at Vitro, anyone else aside from the credit and collection department at Vitro?

THE INTERPRETER: No.

Q Did you ever discuss with anyone the terms and conditions, of either the non-negotiable copy or the original bill of lading, issued for the Zapoteca -- issued from the Zapoteca, sorry?

THE INTERPRETER: I don't remember.

Page 28

KEANE - SOSA

Q Am I correct that the non-negotiable copy, that we have a xerox or duplicate of, has no signature on it?

THE INTERPRETER: That's correct.

Q Did you keep a copy of the original and non-negotiable copy, in the file, for the Zapoteca shipment?

THE INTERPRETER: I'm not sure. At least I have one photostatic copy -- could be from the non-negotiable copy or from the original.

Q Do you know what is used, in order to pick up the cargo at the port of delivery, what document is used?

THE INTERPRETER: No.

Q Do you know what bank the credit and collection department sent the package of documents, you prepared, for the Zapoteca to?

THE INTERPRETER: No, I don't know.

Q Do you know if there's a letter of credit involved in that shipment?

THE INTERPRETER: No, there isn't.

Q Do you get involved in that as a credit?

THE INTERPRETER: Yes.

Q In order to get payment under a letter of

Page 29

KEANE - SOSA

credit, do you have to present the original bill of lading, or is it sufficient to present a non-negotiable copy?

THE INTERPRETER: The original is necessary.

Q Do you ever get involved in arranging for the collection of imported cargo?

THE INTERPRETER: No.

(Whereupon, the original Bill of Lading was marked Deposition Exhibit 8 for identification.)

BY MR. KEANE:

Q That's a two page document. If you look at the second page, it has a stamp saying Vitro Cristal Glass and a signature under it. Have you ever seen bills of lading with that kind of stamp and endorsement on it?

MR. DALEN: Objection to the form of the question.

THE INTERPRETER: No, I have not seen it.

Q Do you recognize the signature you see there under Cristal Glass as stamped?

THE INTERPRETER: No.

Q Did anyone in 2004, contact you concerning

Sofia Edith Sosa
AIG Mexico Seguros, Interamericana S.A. de C.V. v. M/V ZAPOTECA, et al.

July 25, 2007

9 (Pages 30 to 33)

## Page 30

DALEN - SOSA

the shipment of end caps or glass aboard the Zapoteca, after it sailed?

THE INTERPRETER: Yes.

Q What did they contact you about?

THE INTERPRETER: To give them a copy of the documents.

Q Did you do that?

THE INTERPRETER: Yes.

Q Who did you give them to?

THE INTERPRETER: I'm not sure. I think it was for the risk management department.

Q Did anyone ask you what your understanding was, as far as the terms and conditions of the bills of lading?

THE INTERPRETER: No. The only relevant term was clean and onboard.

MR. KEANE: Thank you very much. I appreciate your time.

MR. DALEN: I have one or two questions.

EXAMINATION

BY MR. DALEN:

Q You've earlier testified that Ultra Transport provided you with several copies and original bills of lading. You don't know how many

## Page 31

KEANE - SOSA

there are, is that correct?

THE INTERPRETER: That's correct, three original documents and several non-negotiable copies.

Q Now you earlier, in response to a question, indicated that you provided the bills of lading to your credit department, is that right?

THE INTERPRETER: Correct.

Q Did you turn over both, the bills of lading marked original and the bills of lading marked copy non-negotiable, to the credit department?

THE INTERPRETER: I gave them the three original documents, and if I was -- if I had been given the three non-negotiable copies, I could have given them to credit and collection, and if there were two, the two of them.

MR. DALEN: No further questions.

EXAMINATION

BY MR. KEANE:

Q Do you recall what you did, in this particular case involving the Zapoteca, in June of 2004, as far as what you gave to the credit and collection department?

## Page 32

KEANE - SOSA

THE INTERPRETER: I don't remember, but it must be in the file.

Q Okay. But it certainly had to be, at least the three original bills of lading, is that correct?

THE INTERPRETER: Yes.

Q You understand that the original bill of lading -- without that, there would no payment, correct?

MR. DALEN: Objection to the form.

THE INTERPRETER: I don't know.

BY MR. KEANE:

Q Do you know that it's the original that must be provided to the credit and collection department --

MR. DALEN: Objection to the form.

BY MR. KEANE:

Q -- regarding -- regardless of what happens with the non-negotiable copy -- regardless of what happens with the non-negotiable copy?

THE INTERPRETER: The non-negotiable copies have to be delivered to the credit and collection department, if I get a maximum of three. If I get more, I can keep the excess ones.

## Page 33

DALEN - SOSA

Q But you have to give the three originals to the credit and collection department?

THE INTERPRETER: Yes.

MR. KEANE: That's all I have.

EXAMINATION

BY MR. DALEN:

Q You also have to give the copies, is that correct, the non-negotiable copies?

THE INTERPRETER: Yes.

Q Just so we have the record clear, regardless would be probably be wrong. You previously identified this is the bill of lading for the cargo transported on the Zapoteca on June 14th, 2004, is that correct?

THE INTERPRETER: Yes.

MR. DALEN: No further questions.

(Deposition concluded at 4:10 p.m.)

Tom Crites and Associates International Inc.
www.critesintl.com

**480**

Sofia Edith Sosa
AIG Mexico Seguros, Interamericana S.A. de C.V. v. M/V ZAPOTECA, et al.

July 25, 2007

10 (Pages 34 to 36)

Page 34

ATTESTATION

I, the undersigned, have read the foregoing transcript, and, with the exception of any corrections, specified on the attached correction sheet, attest it constitutes a true and correct transcription of my testimony given at the time and place specified.

(Signed)_____

Witness Name

(Witness)_____

(Date)_____

Page 35

ERRATA SHEET

STATE OF GEORGIA )
COUNTY OF CHATHAM)

I wish to make the following changes for the following reasons:

PAGE LINE
____ ____ CHANGE: _____
REASON: _____
PAGE LINE
____ ____ CHANGE: _____
REASON: _____
PAGE LINE
____ ____ CHANGE: _____
REASON: _____
PAGE LINE
____ ____ CHANGE: _____
REASON: _____
PAGE LINE
____ ____ CHANGE: _____
REASON: _____
(Signed)_____

KD

Page 36

CERTIFICATE
GEORGIA :
CHATHAM COUNTY :

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 33 represent a true and correct transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.

His the 27th day August, 2007.

_____

Kathleen Dore, Certified Court
Reporter, B-2041

Sofia Edith Sosa
AIG Mexico Seguros, Interamericana S.A. de C.V. v. M/V ZAPOTECA, et al.

July 25, 2007

| A | | | | |
|---|---|---|---|---|
| **A** | back 9:2 11:13,15 17:23 24:5,25 | 36:14,17 | copies 18:7,12,13 18:14,18 26:2,13 | 27:10 29:19 30:1 30:20,22 31:19 |
| aboard 10:4 11:11 11:21 13:8 19:10 19:11 30:2 | backs 24:5 | certainly 32:4 | 30:24 31:5,16 | 32:11,17 33:1,7 |
| accepting 4:9 | Bad 12:25 | CERTIFICATE 3:14 | 32:23 33:8,9 | 33:17 |
| accurately 4:14 | bank 23:5 26:16 | Certified 1:19 36:21 | copy 18:18 20:16 22:10,11 24:19 | Date 34:17 day 36:18 |
| act 12:5 | Based 20:3 | certify 36:7,13 | 24:19,21,23 25:6 | days 20:7 |
| acted 12:2 | basis 7:23,23,23 | CHANGE 35:9,12 | 25:12,16 26:6,17 | De 1:5 5:20 |
| actions 11:24 | behalf 4:3 | 35:15,18,21 | 27:7,17,22 28:2 | deal 8:10 10:12 |
| address 4:6 | best 21:6,16 25:22 | changes 19:17 | 28:6,7,10,11 | 11:2 12:18 13:2 |
| afternoon 4:23 | bill 3:19 10:17 15:3,4 16:24 | 35:6 | 29:4 30:6 31:12 | 13:3 |
| agent 16:16 | 17:2,9,20 18:6 | charge 14:22 27:5 | 32:20,21 | dealing 8:17 9:3 |
| agreement 1:18 4,11 | 19:4,7,8,14 | CHATHAM 35:4 | correct 11:12,22 17:22 22:7,20 | 9:22 |
| AIDE 2:19 4:13 | 20:11 21:2 22:5 22:12,23 23:16 | 36:5 | 24:5 25:6 28:2,5 | dealt 7:22 12:18 12:22 |
| AIG 1:4 | 24:4,9,12,22 | check 24:9 | 31:2,3,9 32:6,10 | decided 14:2 |
| airline 10:24 | 25:9,23 27:23 | City 2:23 | 33:9,15 34:7 | Defendants 1:13 |
| allow 19:9 | 29:2,10 32:8 | clarify 19:13 | 36:11 | 1:17 2:10 |
| answer 5:15 | 33:13 | clean 30:17 | corrected 22:16 | del 2:21,22 |
| answers 5:10 36:9 | bills 7:20 8:4,7,10 | clear 33:11 | correction 34:6 | delivered 32:23 |
| anywise 36:16 | 8:18,23 9:4,9 | closing 20:5 | corrections 17:22 | delivery 28:13 |
| Apolinar 16:8 | 10:12 12:12,13 | Col 2:22 | 17:24 34:6 | department 14:3 |
| appear 22:11 | 12:15 15:23 | collection 23:2,18 | counsel 1:17,18 | 23:2,18,25 27:19 |
| APPEARANCE 2:3 | 16:19 20:13 21:7 | 23:25 27:19 | 2:3 4:16 36:14 | 28:17 30:12 31:8 |
| appearing 4:2 | 21:13 22:2,10 | 28:17 29:8 31:17 | 36:15 | 31:13,25 32:16 |
| appreciate 30:19 | 23:9,13,20 29:17 | 31:25 32:15,24 | COUNTY 35:4 | 32:24 33:3 |
| approval 21:14 | 30:15,25 31:7,10 | 33:3 | 36:5 | departments 9:13 |
| approve 19:8,16 | 31:11 32:5 | colored 24:13 | course 12:9 | deposition 1:16 |
| approved 16:24 18:3 | boilers 1:10 | come 10:17 21:25 | court 1:2,19 4:5 | 29:11 33:20 |
| approximately 9:24 | break 5:17 | 22:4 23:12 25:16 | 5:12 36:21 | described 21:10 |
| ARECHAVALETA | Broadway 2:7,13 | 25:18 | cover 6:19 | DESCRIPTION |
| 2:16 | business 10:22 | comes 24:12 | Coyacan 2:22 | 3:18 |
| arrangement 10:16 | B-2041 36:22 | coming 8:15 | credit 23:2,17,25 | difference 12:11 |
| arranging 29:7 | | companies 10:24 | 27:18 28:16,20 | different 11:5 12:4 |
| arrives 19:7 | **C** | 11:9,18 12:2 | 28:23 29:2 31:8 | 12:5,7 23:22 |
| aside 27:18 | C 3:17,17 36:3,3 | company 9:11 | 31:12,17,24 | 24:12,13 |
| asked 13:15 | called 9:19 | 12:22 14:17 | 32:15,23 33:3 | differently 11:25 |
| asking 27:11,14 | capacity 5:24 7:19 | compared 19:25 | Cristal 9:16 15:15 | 12:5 |
| Associates 4:4 | caps 9:19 14:16 | 19:25 | 15:17 23:7,23 | direct 10:18 12:24 |
| attached 22:24 34:6 | 15:15 16:13 | completely 21:23 | 29:16,23 | direction 36:10 |
| attest 34:7 | 20:25 30:2 | concern 24:3,6 | Crites 4:3 | Directly 27:2 |
| ATTESTATION | caption 36:8 | concerning 5:3 | customer 6:14 | DIRECTOR 2:17 |
| 3:12 | captured 21:15 | 22:6 29:25 | 14:18 15:9,14 | disclose 4:8 |
| attorney 5:3 | cargo 7:20,25 8:8 | concluded 33:20 | 21:11 23:6,21,24 | discuss 10:4 |
| August 36:18 | 9:16,18 19:2,10 | conclusion 27:12 | 24:17 | 27:21 |
| author 17:21,21 | 19:18,19,22 20:4 | conditions 24:6,7 | customers 6:10 | discussed 21:5 |
| Av 2:21 | 20:7,10 22:6 | 27:22 30:14 | 7:12 | DISTRICT 1:2,2 |
| | 26:13 29:8 33:14 | confirm 15:2 | customer's 16:16 | Division 2:21 |
| **B** | Carmen 2:22 | constitutes 34:7 | C.V 1:5 | document 26:4,9 |
| B 2:5 | carriage 7:20 8:8 24:6,7 | Consultant 6:14 | | 28:13 29:14 |
| | carried 13:3,7 | contact 10:17,18 11:7,10,17,20 | **D** | documents 8:15 22:25 23:15,24 |
| | carries 10:25 | 12:24 29:25 30:5 | D 3:3,17,17 | 28:18 30:7 31:4 |
| | case 1:8 4:12 23:7 | containers 12:10 | daily 7:23 | 31:15 |
| | 23:21 31:23 | contract 27:8 | Dalen 2:5 3:7,9 | Dora 1:18 36:21 |
| | | contractual 4:10 | 13:10 15:25 | |

Tom Crites and Associates International Inc.
www.critesintl.com

Sofia Edith Sosa
AIG Mexico Seguros, Interamericana S.A. de C.V. v. M/V ZAPOTECA, et al.

draft 16:23 17:2,7 17:9,19,25 18:3 19:8,21,25 20:11 20:18 21:2,13
drafts 19:14 20:19 21:3
duly 4:14,19
duplicate 29:3
duties 7:13

**E**

E 3:3,17,17,17,17 34:3 36:3,3,4
earlier 30:23 31:6
Ed 5:2
Edith 1:16 4:18,25
education 6:25
EDWARD 2:11
either 19:16 22:17 24:24 27:22
employ 36:15
employed 5:19,21 5:25 6:23
employer 4:3,8
employment 6:19
endorsement 29:18
engines 1:10
English 4:15,16
enlarged 25:3
entered 4:10
ERRATA 3:13 35:2
ESQUIRE 2:5,11
ETA 14:14
evidence 36:12
exactly 10:11
EXAMINATION 3:5 4:21 30:21 31:20 33:6
exception 34:5
excess 32:25
Exhibit 22:8 26:5 29:12
export 7:17
exports 6:10,15 7:12
e-mail 14:8,11,20

**F**

F 36:3
familiar 7:19
far 12:13,21 13:9 21:7,18,20 23:14 23:23 30:14

31:24
Figueroa 16:9
file 20:19 28:7 32:3
fill 15:4
final 20:16
finally 19:17
fine 5:15 17:12
Finished 6:4
first 4:14,19 6:24 8:14 9:21 13:6,8 13:11,14,16 19:21
five 6:6 22:8
Floor 2:13
followed 12:14 21:6
following 8:25 11:14 35:5,6
follows 4:17,20
foregoing 34:4 36:7,10
form 15:25 27:10 29:19 32:11,17
forms 24:13
Four 6:12
fourth 22:9
frame 26:8
free 17:13
front 5:12 24:4,25 25:2
further 31:19 33:17 36:13

**G**

G 36:4,4
GENERAL 2:20
GEORGIA 35:3
GERENTE 2:20
getting 21:7
give 5:7 15:6,18 24:18,20 30:6,10 33:2,8
given 15:10 31:16 31:17 34:8 36:12
giving 5:10
glass 9:16 15:15 15:17 23:7,23 29:16,23 30:2
going 5:7 14:4
good 4:23 19:18
guess 17:17

**H**

H 8:11,18 9:4 25:3

half 5:23 6:18
handle 11:24
handled 12:16
handling 12:9
happen 14:19,24 18:4
happened 13:9 21:17
happens 32:19,21
Hayden 2:6
head 6:9 7:11
hearing 36:12
held 10:13
higher 12:8
highest 6:25
Hill 2:6
hired 9:12
history 6:19
hold 6:8 7:10

**I**

IBARRARAN 2:19
identification 29:12
identified 33:13
imagine 17:15
imported 29:8
includes 14:13
indicated 31:7
information 15:3 15:4,6,9,18,23 16:10,14 19:24 20:3 21:9
instances 12:6
instructions 4:7
Int 2:22
INTERAMERIC... 1:5
interested 36:16
INTERORIENT 1:11
interpret 4:15
INTERPRETER 2:19 5:20 6:2,4,6 6:9,12,14,21,24 7:3,6,8,11,15,18 7:21,24 8:3,6,9 8:13,16,20,24 9:6,11,15,20,25 10:7,10,15,18,21 10:23 11:4,13,23 12:3,7,15,20,23 13:5,16,20,24 14:2,7,10,13,21 14:25 15:8,13,16

15:20 16:3,7,12 16:16,19,22 17:3 17:6,11,15,21 18:2,5,9,13,20 18:23,25 19:6,11 19:20,24 20:12 20:15,20 21:4,18 21:23 22:7,13,18 22:21,24 23:5,11 23:14,19 24:2,8 24:14,18,24 25:4 25:7,11,14,18,24 26:3,10,14,18,22 26:25 27:4,15,20 27:25 28:5,9,15 28:19,22,24 29:5 29:9,21,24 30:4 30:6,9,11,16 31:3,9,14 32:2,7 32:12,22 33:4,10 33:16
invoice 20:2 23:19
involved 4:11 5:3 8:7 10:6 28:21 28:23 29:7
involvement 13:7 13:9,15
involving 31:23
issuance 12:13 21:7
issue 15:23
issued 8:11 12:12 19:9,14 22:12 27:23,24
itinerary 13:17,23

**J**

JAVIER 2:16
job 6:24
Juarez 4:25
judge 5:9,12
July 1:20
June 7:9 10:5 20:22,24 25:21 31:23 33:14
JURIDICO 2:17

**K**

Kathleen 1:18 36:21
KD 35:25
Keane 2:11,12 3:6 3:8 4:1,22 5:1,2 6:1 7:1 8:1 9:1 10:1 11:1 12:1

13:1,13 14:1
15:1 16:1,4 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1,13 28:1
29:1,13 30:18
31:1,21 32:1,13
32:18 33:5
Keane's 4:5
keep 24:19,20,21 28:6 32:25
KEITH 2:5
kilograms 14:15
kin 36:13
kind 12:8 29:17
know 5:14,15,18 10:3 15:17 16:10 17:5,13,17 19:23 20:13,23 23:3,14 27:15 28:12,16 28:19,20 30:25 32:12,14

**L**

lading 3:19 7:20 8:4,8,11,18,23 9:4,9 10:12,17 12:12,13,15 15:3 15:5,24 16:20,24 17:2,10,20 18:6 19:5,7,8,14 20:11,14 21:2,8 21:13 22:2,5,10 22:12,23 23:10 23:13,16,20 24:4 24:9,12,22 25:10 25:23 27:23 29:3 29:11,17 30:15 30:25 31:8,11,11 32:5,9 33:13
leaves 20:7
left 19:7,12,20,22 20:6,10
legal 27:11
legend 20:17
letter 28:20,25
level 6:25
LINE 35:8,11,14 35:17,20
linien 8:12,18 9:5 25:3
list 23:20
litigation 5:3
LLP 2:6,12

Tom Crites and Associates International Inc.
www.critesintl.com

Sofia Edith Sosa
AIG Mexico Seguros, Interamericana S.A. de C.V. v. MV ZAPOTECA, et al.

July 25, 2007

Page 39

load 12:8
loaded 14:4,16
 19:10
loads 12:9
logistics 7:16 9:13
 14:3 15:8,10,12
 15:22 16:3,5
 20:3 21:11 27:2
long 5:21 6:5,11
look 8:14 29:14
looking 8:21,23
 9:7,9 20:11
loose 9:15,18 12:9
lot 24:5

**M**

M 3:17
machine 5:8
Mahoney 2:12
major 7:3,7
management 7:8
 30:12
manager 16:3,6,8
marked 22:8
 29:11 31:11,12
maximum 32:24
Ma'am 5:2
mean 7:3 12:11
Mexico 1:4,20
 2:23,23 5:20
moment 9:17
 15:21
Monterrey 1:20
monthly 7:23
months 6:6
M/V 1:9 5:3

**N**

N 3:3,17,17 34:3
name 4:23 5:2
 8:11,18,23 9:4,9
 14:14 16:5,8
 17:3,4,11 34:13
NAVIGATION 1:11
necessarily 25:14
necessary 17:22
 29:6
need 5:17
needed 14:15
 15:18,23
New 1:2 2:8,8,14
 2:14
non-negotiable
 18:7,12,14,18
 20:18 24:19,22

25:6,12,16 26:2
 26:6,13,16,20
 27:8,17,22 28:2
 28:7,11 29:4
 31:4,12,16 32:20
 32:21,22 33:9
normal 21:24
Normally 25:18
Norte 2:21
notice 1:17
number 3:18
 12:19 13:3 14:16
 14:17 16:12
 17:14,18 18:15

**O**

O 3:17 34:3 36:4
Objection 15:25
 27:10 29:19
 32:11,17
ocean 7:20 8:2,5,8
 11:9,19
office 4:4,5
officer 7:11
Offices 1:19
okay 8:10,22 9:8
 9:14 10:20 11:2
 13:22 14:13 15:6
 15:12 16:14
 17:24 18:16,21
 20:9 22:19 27:6
 32:4
onboard 19:3
 30:17
once 14:2 16:22
 18:3 27:16
ones 32:25
open 5:11
opportunity 5:5
order 19:9 23:17
 28:12,25
original 3:19 18:6
 18:11 19:4,9,13
 20:8,17 22:2,5
 22:11,12,23 23:9
 23:13,16 24:4,12
 24:13,22 25:9,23
 26:17,21 27:7,15
 27:23 28:6,11
 29:2,5,10 30:25
 31:4,11,15 32:5
 32:8,14
originals 18:16
 25:22 33:2

**P**

package 28:17
packing 23:19
page 3:18 22:9,9
 24:25 25:2 29:14
 29:15 35:8,11,14
 35:17,20
pages 22:9 26:5
 36:11
paper 20:15
paperwork 7:16
PARRA 2:19 4:13
part 26:5
particular 6:3
 31:23
parties 36:14,15
party 4:11
passed 16:15
 21:12
payment 28:25
 32:9
people 12:19,20
 12:21 13:4,5
person 12:17,22
 13:2,20 16:23,25
 17:9,11
personam 1:12
persons 15:17
perspective 21:22
 21:24
photocopied 26:5
photostatic 24:19
 24:21 28:10
pick 28:12
place 15:11 34:9
Plaintiff 1:6 2:4
Plano 5:20
please 4:24 5:13
point 19:19 21:21
port 20:6 28:13
pose 5:11
position 6:5,7,11
 6:17 7:9,14 10:8
 10:9,13
possible 13:17
prepared 21:13
 28:18
present 2:16
 23:17,25 29:2,3
presented 19:15
 21:2,3,10
presently 5:19,24
previously 33:13
printed 20:16
probably 33:12

procedure 12:13
 21:5
process 20:6
 21:16
produced 4:19
product 6:3,4
provide 4:5 15:22
 16:11
provided 30:24
 31:7 32:15
Purchase 6:2
pursuant 1:17 4:7
put 23:16,24
p.m 1:20 4:6 33:20

**Q**

question 5:13
 11:13 12:25 16:2
 27:11 29:20 31:7
questions 4:16
 5:6,11 30:20
 31:19 33:17 36:9

**R**

R 3:17 36:3,4
reached 7:2
read 5:9 9:2 11:13
 11:15 24:9 34:4
REASON 35:10,13
 35:16,19,22
reasons 35:7
recall 10:5 17:9
 20:21,25 21:7
 26:8,12 31:22
receive 24:8 25:5
 25:8,9,22,25
 27:16
received 18:22
 19:4,21 21:25
 22:4,19 26:12,16
receiving 26:8
recognize 22:15
 22:16 29:22
recollect 21:16
 25:23
recollection 8:17
 9:3
recommended
 9:12
record 4:24 5:8,8
 33:11
reduced 36:9
reference 17:8
 20:21 21:6
referring 20:24

refers 26:7
regard 11:24 13:2
regarding 16:19
 32:19
regardless 32:19
 32:20 33:12
regular 36:15
relevant 30:16
rem 1:10
remember 10:11
 15:20 17:12 21:4
 21:19,20 26:14
 27:25 32:2
repeat 8:24
rephrase 5:14
reporter 1:19 4:2
 4:5,9 36:22
represent 36:11
representative
 10:19,20,24
request 14:7
requested 4:4
requesting 14:17
required 15:4
reservation 15:2
reserve 14:6
reserved 14:5,14
respect 11:2
respond 13:22
response 5:7 31:6
responses 4:16
result 36:16
retain 24:11,16
returned 23:13
right 5:12,18
 15:10 17:18
 19:18 21:15 24:3
 24:11 31:8
risk 30:12
Rivkins 2:6

**S**

S 34:3
sailed 30:3
SANTOS 2:16
save 20:19
saying 29:15
says 22:10 26:6
second 22:9 29:15
see 8:4 19:23
 22:14 29:22
seen 29:17,21
SEGUROS 1:4
send 13:18 14:20
 16:25 17:25 18:6

Sofia Edith Sosa
AIG Mexico Seguros, Interamericana S.A. de C.V. v. M/V ZAPOTECA, et al.

18:8 23:5,9 24:17
sends 16:23 17:6 20:4
sent 15:10 17:9 18:16,19 21:14 23:6 26:23 28:17
seriousness 5:10
serve 4:9
service 6:15
services 6:9
Seven 5:23
sheet 3:13 34:7 35:2
ship 10:24 13:8 19:3 27:9
shipment 10:4 13:7,12,14 16:13 16:22 20:22,25 22:25 25:8,21 28:8,21 30:2
shipments 7:17 7:25 9:15,23 10:2,6 13:2 20:23
shipped 9:18
SHIPPING 1:11
ships 11:12,22
show 26:4 27:17
signature 22:14 22:15 28:4 29:16 29:22
signatures 22:16 22:17
signed 18:12,21 18:24 19:4 25:12 26:7 34:12 35:23
SOFIA 1:16 4:16
somebody 14:21 27:5
Sophia 4:25
sorry 14:22 16:7 27:24
Sosa 1:16 4:1,18 4:25 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1
SOUTHERN 1:2

space 23:21
Spain 9:16 15:15
Spanish 4:15,15
specific 17:4 18:15
specified 34:6,9
stamp 29:15,17
stamped 25:5 29:23
stand 22:16
start 8:22 9:8 22:2
started 8:21 9:7 9:22
state 4:23 35:3
stated 36:8
STATES 1:2
steamship 11:9 11:18
step 16:18
Stinnes 8:11,18 9:4,22 10:6,12 10:17 11:3,6,11 11:21,25 12:9,21 13:3,8 25:3
sufficient 29:3
Suite 2:7
Supervise 7:15
supervising 7:15
supplies 9:12
supply 14:3
sure 8:20 9:6,25 17:16 18:25 26:3 28:9 30:11
sworn 4:14,19
S.A 1:5

_____ T _____
T 3:17 34:3,3,3,3 36:3,3
tackle 1:10
take 5:9,17 17:23 22:25
taken 1:16 36:8
takes 20:6
talking 13:10,11 15:14
tell 5:15 17:13
term 30:17
terms 27:21 30:14
testified 4:17,20 30:23
testify 8:15
testimony 34:8
Thank 30:18
thereto 36:9

thing 13:8 14:23 14:25
think 8:20 9:6 23:20 30:11
three 10:2 18:17 18:20 23:9 24:12 24:13,14 25:19 25:19,22 31:3,14 31:16 32:5,24 33:2
time 13:11 18:22 19:4,18 21:25 22:4 23:12 25:9 26:8,17,21 30:19 34:8
today 4:2,6 8:15
Tom 4:3
tons 14:15
transcript 34:5 36:7,12
transcription 34:8
Transport 10:21 10:22 11:10,20 12:17,25 13:4,21 14:9,12 16:17,23 16:25 17:6,10,23 18:5,9 21:12,13 26:23 30:24
transportation 8:5 9:23 10:25 11:3 11:5,8,9,11,18 11:19,21 12:2
transported 33:14
triplicate 22:5,20 22:23 23:16 25:17
true 34:7 36:11
try 19:13
turn 31:10
two 6:18 10:2 18:6 18:11,13 20:7 22:15,17 25:20 26:5 29:14 30:20 31:18,18
type 6:3 14:16 16:12 20:15
types 11:8,17
typewriting 36:10
typical 10:16 21:21
typically 12:18 13:6 14:23 17:19 25:13 26:19

_____ U _____

U 3:17
Ultra 10:21,22 11:10,20 12:17 12:25 13:4,20 14:9,11 16:17,23 16:25 17:6,10,23 18:5,9 21:12,13 21:14 26:23 30:23
undersigned 34:4
understand 5:13 32:8
understanding 19:2 20:9 27:6 30:13
UNITED 1:2
university 7:4,5,7

_____ V _____

V 3:17
various 12:21
version 20:16
vessel 10:4 13:23 14:3,4,6,14 19:6 19:21 20:5
vessels 11:3 13:17,23
vessel's 20:10
Vitro 1:19 2:17 5:20,22 6:20 7:17,25 8:8 13:7 15:12,24 23:13 24:16 27:8,18,19 29:15
volume 12:8 13:18 14:15
vs 1:8

_____ W _____

want 17:3
wanted 13:18
warehouse 16:8
wasn't 17:5
way 21:10 26:19
week 8:3,9,10
weekly 7:23,24,25
weight 16:13
we're 15:14
we've 21:5 22:8
Whichever 8:22 9:8
wish 4:8 35:5
witness 4:17,20 34:13,15
woman 5:7

words 21:9
worked 26:19
wrong 33:12

_____ X _____
X 3:3
xerox 22:10 28:3

_____ Y _____
Y 3:17
year 8:22 9:8,21
years 5:23 6:12,16 6:18 17:14,18
York 1:2 2:8,8,14 2:14

_____ Z _____
Zapoteca 1:9,10 5:4 10:4 17:8 20:22,24 21:6,17 21:21 22:6,12 25:21 26:7,11 27:24,24 28:7,18 30:3 31:23 33:14

_____ 0 _____
05CV 1:8

_____ 1 _____
1 22:8 26:5 36:11
10 10:10
10th 2:13
10006 2:8,14
111 2:13
14th 33:15
1500 2:7

_____ 2 _____
2002 8:21 9:7
2003 8:21 9:7
2004 7:9 8:2,12 10:5,14 13:15 16:6 20:22,24 25:21 29:25 31:24 33:15
2007 1:20 36:18
25 1:20
2655 2:21
27th 36:18
29 3:19

_____ 3 _____
3 2:22
3:00 4:6
3:10 1:20

Tom Crites and Associates International Inc.
www.critesintl.com

Sofia Edith Sosa
AIG Mexico Seguros, Interamericana S.A. de C.V. v. M/V ZAPOTECA, et al.

| | | | | | |
|---|---|---|---|---|---|
| 30 3:7 | | | | | |
| 31 3:B | | | | | |
| 33 3:9 36:11 | | | | | |
| 34 3:12 | | | | | |
| 35 3:13 | | | | | |
| 36 3;14 | | | | | |
| **4** | | | | | |
| 4 3:6 | | | | | |
| 4:10 33:20 | | | | | |
| 45 2:7 | | | | | |
| **5** | | | | | |
| 5887(JES) 1:8 | | | | | |
| **8** | | | | | |
| 8 3:19 29:12 | | | | | |

# Exhibit "4"

**BILL OF LADING**
FOR COMBINED TRANSPORT OR PORT TO PORT SHIPMENT

SHIPPER
P. 1/1
DISTRIBUIDORA DE VIDRIO DE MEXICO, S.A. DE C.V.
CARRETERA A GARCIA KM. 10 S/N GARCIA, N.L.
CONTACTO: VIRGINIA GARZA
TEL: 52 88431500

B/L No
STINATHIS414009

SHIPPER REFERENCE
HK DSE51241

CONSIGNEE
VITRO CRISTAL GLASS
C/NARAYA, S/N POLIGONO CABO CALLEJA
28947 FUENLABRADA, MADRID ESPAÑA
CONTACT: CARLOS GONZALEZ TEL:34987111200

**H. STINNES LINIEN GmbH**

NOTIFY ADDRESS (Carrier not to be responsible for failure to notify)
VITRO CRISTAL GLASS
C/NARAYA, S/N POLIGONO CABO CALLEJA
28947 FUENLABRADA, MADRID ESPAÑA
CONTACT: CARLOS GONZALEZ TEL:34987111200

| LOCAL VESSEL | FROM | PLACE OF RECEIPT (applicable only when this document is used as a Combined Transport Bill of Lading) |
|---|---|---|
| OCEAN VESSEL/VOY.No | PORT OF LOADING | |
| ZAPOTECA V.~ 414 | ALTAMIRA, MEXICO | PLACE OF DELIVERY (applicable only when this document is used as a Combined Transport Bill of Lading) |
| PORT OF DISCHARGE | FOR TRANSHIPMENT TO | |
| LA CORUNA, ESPAÑA | | |

| CONTAINER NUMBER MARKS AND NUMBERS | | QUANTITY AND TYPES OF PACKAGES DESCRIPTION OF GOODS SAID TO CONTAIN | GROSS WEIGHT (KGS) | MEASUREMENT (cbm) |
|---|---|---|---|---|
| DVM-024381 | 612 | END CAPS SAID TO BE: | P. Bruto 7,580,631.00 KGS | |
| | | 37 END CAPS CON 5,519 LAMINAS | P. Neto 7,264,631.00 KGS | |
| | | VIDRIO FLOTADO CLARO 4MM 2.55X3.302 | | |
| | | 19 END CAPS CON 1,216 LAMINAS | | |
| | | VIDRIO FLOTADO CLARO 9.5MM 2.55X3.302 | | |
| | | 16 END CAPS CON 988 LAMINAS | | |
| | | VIDRIO FLOTADO CLARO 8MM 2.55X3.66 | | |
| | | 558 END CAPS CON 68,043 LAMINAS | | |
| | | VIDRIO FLOTADO CLARO 4MM 2.55X3.66 | | |
| | | 1 END CAP CON 58 LAMINAS | | |
| | | VIDRIO FLOTADO CLARO 8MM 2.55X3.66 | | |
| | | Y 6 LAMINAS VIDRIO FLOTADO CLARO | | |
| | | 4MM 2.55X3.66 | | |
| | | 1 END CAP CON 64 LAMINAS | | |
| | | VIDRIO FLOTADO CLARO 9.5MM 2.55X3.302 | | |
| | | Y 25 LAMINAS VIDRIO FLOTADO CLARO | | |
| | | 4MM 2.55X3.302 | | |
| | | TOTAL DE LAMINAS 75,919 | | |
| | | | | |
| | | LINER IN/FREE OUT CUSTOMARY | | |
| | | QUICK DISPATCH. LIFO TERMS | | |

SAID TO WEIGH AS VESSEL
HAD NO POSSIBILITY TO
VERIFY CARGO.-

FREIGHT PREPAID
RECEIVED ON BOARD
CLEAN ON BOARD

**ORIGINAL**

THE BILL SAID TO BE... evidence of the receipt by the Carrier in apparent good order and condition, except as otherwise noted, of the total number of containers, packages or units specified above and proof to the contrary shall not be admissible when this Bill of Lading has been transferred to a third party acting in good faith. However, no representation is made by the Carrier as to the weight, contents, measure, quantity, quality, description, condition, marks, numbers or values of Goods and the Carrier shall be under no responsibility whatsoever in respect of such description or particulars.

Annotations only when this document used as a Timney's Bill of Lading

| TOTAL NUMBER OF CONTAINERS | | | |
|---|---|---|---|
| CONTAINER PACKING/UNPACKING | | | |

**EXHIBIT**
8 MEXICO
7.25.07

| FREIGHT/CHARGE INDICATOR | PREPAID | COLLECT |
|---|---|---|
| Seafreight | | |
| Landing charge | | |
| Landing charge Destination | | |
| Container Service Charge Origin | | |
| Container Service Charge Destination | | |
| Freight As Agreed | | |

| FREIGHT PAYABLE AT | PLACE AND DATE OF ISSUE |
|---|---|
| ORIGEN | ALTAMIRA, MEXICO Jun 14, 2004 |
| NUMBER OF ORIGINAL B/L | FOR THE CARRIER |
| 3 / 3 | NAVEMAR INTERNACIONAL, S.A. DE C.V. AS AGENTS.- |

RECEIVED... [illegible fine print]

H. STINNES LINIEN GmbH
Gumm 8 · 20457 Hamburg Fed. Rep. of Germany
POB 110449 · Phone (40) 30 857 0 Fax (40) 30 807110

PAGE 1 CONDITIONS OF CARRIAGE

488

# Exhibit "5"

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

AIG MEXICO SEGUROS,
INTERAMERICANA S.A.
DE C.V.,
 Plaintiff,

CASE NO: 05CV 5887(JES)

M/V "ZAPOTECA", her
engines, tackle, boilers,
etc. in rem; ZAPOTECA
SHIPPING CO., LTD., and
INTERORIENT NAVIGATION CO.
LTD., in personam.
 Defendants.

CD ENCLOSED

The deposition of ESTANISLAO MALLO, taken by counsel for the Defendant, pursuant to notice and agreement of counsel, before Kathleen Dore, Certified Court Reporter, at Vitro CristalGlass Camponaraya, Spain, January 24, 2008, at 9:00 a.m.

**TOM CRITES & ASSOCIATES INTERNATIONAL, INC.**

A PROFESSIONAL ASSOCIATION OF STENOTYPE REPORTERS

New York, New York

(800) 631-3480

KEANE - MALLO

facts, which is part of your Exhibit 44. You received this from the vessel's agent?

THE WITNESS: Yes.

Q Do you recall the name of the vessel's agent?

THE WITNESS: Yes, Maritima Consiflet. It's very simple and easy to know because it's always the same one for these glass shipments.

Q Now, the information that's typed in here, was that provided to you by Maritima Consiflet?

THE WITNESS: Yes, I believe so, yes.

Q Who is -- your understanding -- the owner of the vessel Zapoteca?

THE WITNESS: I don't know who the vessel owner is.

Q Did you look in the statement of fact?

MR. DALEN: Objection to the form of the question.

THE WITNESS: It's a German company.

BY MR. KEANE:

Q What's its name?

THE WITNESS: Stinnes.

Q Did they tell you that was the owner of the Zapoteca, when you dealt with them? When I say

**490**

KEANE - MALLO

them, Maritima Consiflet?

THE WITNESS: No, no, no. This -- let me just say that this document was an attachment to a report that they sent me.

I just requested from them so that I could determine what shifts were working, and what time, so I could get a better picture of the discharge.

Q Is this the full report that they sent you?

THE WITNESS: They sent me this and the bill of lading.

Q And the bill of lading is the next page, and it says original. You received a copy, correct?

THE WITNESS: It was by fax.

Q The bill of lading is not signed by the master, is it?

THE WITNESS: I don't know. I don't know his signature -- I don't know whose signature.

Q Does it say for the carrier as agents?

A Si.

Q In your experience, does that mean that's not signed by the master, it's signed by the carrier's agent?

BSI Inspectorate Española, S.A.
Estrecho de Mesina, 13 - 28043 Madrid – Spain
Tel +34 91 597 22 72 Fax +34 91 597 46 08
C.I.F./V.A.T. No. A-28633500 E-mail info@bsi-inspectorate.es

P. 1/1

DISTRIBUIDORA DE VIDRIO DE MEXICO, S.A. DE C.V.
CARRETERA A GARCIA KM. 10 S/N GARCIA, N.L.
CONTACTO; VIRGINIA GAMEZ
TEL: 83 ................

VITRO CRISTAL GLASS
C/MARIA, S/N POLIGONO CAMO CALLEJA
28947 FUENLABRADA, MADRID ESPAÑA
CONTACT:CARLOS GONZALEZ TEL:34917111200

VITRO CRISTAL GLASS
C/MARIA, S/N POLIGONO CAMO CALLEJA
28947 FUENLABRADA, MADRID ESPAÑA
CONTACT:CARLOS GONZALEZ TEL:34917111200

**H. STINNES LINIEN GmbH**

ZAPOPECA V.- 414 ALTAMIRA, MEXICO

LA CORUÑA, ESPAÑA

DVM-024281 633

| | | |
|---|---|---|
| 6ND CAPS MAIN TO KE; | P. bruto | 7,590,631.00 KGS |
| 17 END CAPS CON 6,519 LAMINAS | P. Neto | 7,344,631.00 KGS |
| VIDRIO FLOTADO CLARO 4MM X.5XX1.503 | | |
| 15 END CAPS CON 1,216 LAMINAS | | |
| VIDRIO FLOTADO CLARO 5.5MM 2.55X1.302 | | |
| 1F END CAPS CON 968 LAMINAS | | |
| VIDRIO FLOTADO CLARO 5MM 2.50X1.66 | | |
| 921 END CAPS CON 48,043 LAMINAS | | |
| VIDRIO FLOTADO CLARO 6MM 2.5X1.66 | | |
| 5 END CAP CON 53 LAMINAS | | |
| VIDRIO FLOTADO CLARO 8MM 2.55X1.65 | | |
| Y 5 LAMINAS VIDRIO FLOTADO CLARO | | |
| 4MM 2.55X1.86 | | |
| 1 END CAP CON 54 LAMINAS | | |
| VIDRIO FLOTADO CLARO 3.5MM 2.55X1.202 | | |
| Y 25 LAMINAS VIDRIO FLOTADO CLARO | | |
| 4MM 2.55X1.202 | | |
| TOTAL DE LAMINAS 75,933 | | |

LINER IN/FREE OUT CUSTOMARY
QUICK DISPATCH, LIFO TERMS

SAID TO METER AS VESSEL;
AND NO POSSIBILITY TO

FREIGHT PREPAID
RECEIVED ON BOARD
CLEAN ON BOARD

**ORIGINAL**

DRIVER ALTAMIRA, MEXICO Jun 14, 2004

NAVIMAR INTERNACIONAL, S.A. DE C.V.
AS AGENTS.-

# *Exhibit "6"*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

AIG MEXICO SEGUROS,
INTERAMERICANA S.A.
DE C.V.,
 Plaintiff,

CASE NO: 05CV 5887(JES)

M/V "ZAPOTECA", her
engines, tackle, boilers,
etc. in rem; ZAPOTECA
SHIPPING CO., LTD., and
INTERORIENT NAVIGATION CO.
LTD., in personam.
 Defendants.

> CD
> ENCLOSED

The deposition of JUAN CARLOS CUESTA, taken by counsel for the Defendant, pursuant to notice and agreement of counsel, before Kathleen Dore, Certified Court Reporter, at The AC Hotel, Ponferrada, Spain, January 23, 2008, at 3:00 p.m.

**TOM CRITES & ASSOCIATES INTERNATIONAL, INC.**

A PROFESSIONAL ASSOCIATION OF STENOTYPE REPORTERS

New York, New York

(800) 631-3480

DALEN - CUESTA

MR. DALEN: What do you want?

BY MR. KEANE:

Q The photos.

THE WITNESS: Can I --

Q I'm getting ready for another question, but please answer.

THE WITNESS: This report was made August of 2004, on the basis of speaking to several people who are named here, and pictures were shown from someone, and someone from CristalGlass was also interviewed.

Something that I underlined that I wanted to highlight here, that I noticed when I first read it, the expert said that the captain signed the bill of lading.

It doesn't seem to be the case. The agent signed that, but what really drew my attention was point two. This is what they speak about or mention here what SGS said. We're talking what someone said someone said, and it says that the SGS person said water was --

A Pouring.

THE WITNESS: -- pouring down from the inside. This would have been apparent to anyone

From: 981 121044 Page: 0/8 Date: 05.07.2004 11:08:50

02/07 2004 21:51 FAX 981218360 CGO

**BILL OF LADING**
FOR COMBINED TRANSPORT OR PORT TO PORT SHIPMENT

| | |
|---|---|
| **SHIPPER** P. 1/1 | BTIMATHIS414009 |
| DISTRIBUIDORA DE VIDRIO DE MEXICO, S.A. DE C.V. | XF 04051341 |
| CARRETERA A GARCIA KM. 10 S/N GARCIA, N.L. | |
| CONTACTO: VIRGINIA GARZA | |
| TEL: 52 88621500 | |

**CONSIGNEE**

VITRO CRISTAL GLASS
C/NARAYA, S/N POLIGONO CABO CALLEJA
28947 FUENLABRADA, MADRID ESPAÑA
CONTACT:CARLOS GONZALEZ TEL:34987111200

**H. STINNES LINIEN GmbH**

**NOTIFY ADDRESS**

VITRO CRISTAL GLASS
C/NARAYA, S/N POLIGONO CABO CALLEJA
28947 FUENLABRADA, MADRID ESPAÑA
CONTACT:CARLOS GONZALEZ TEL:34987111200

| LOCAL VESSEL | FROM | PLACE OF RECEIPT |
|---|---|---|
| OCEAN VESSEL/VOYAGE No ZAPOTECA V.- 414 | PORT OF LOADING ALTAMIRA, MEXICO | PLACE OF DELIVERY |
| PORT OF DISCHARGE LA CORUÑA, ESPAÑA | FOR TRANSHIPMENT TO) | |

| CONTAINER/MARKS AND NUMBERS | QUANTITY AND TYPES OF PACKAGES, DESCRIPTION OF GOODS | SAID TO CONTAIN | GROSS WEIGHT (KGS) | MEASUREMENT (CBM) |
|---|---|---|---|---|
| DVH-024381 632 | END CAPS SAID TO BE:<br>37 END CAPS CON 5,919 LAMINAS<br>VIDRIO FLOTADO CLARO 4MM 2.55X3.302<br>19 END CAPS CON 1,315 LAMINAS<br>VIDRIO FLOTADO CLARO 5.5MM 2.55X3.302<br>16 END CAPS CON 988 LAMINAS<br>VIDRIO FLOTADO CLARO 6MM 2.55X1.66<br>556 END CAPS CON 68,043 LAMINAS<br>VIDRIO FLOTADO CLARO 4MM 2.55X3.68<br>1 END CAP CON 58 LAMINAS<br>VIDRIO FLOTADO CLARO 8MM 2.55X3.66<br>Y 5 LAMINAS VIDRIO FLOTADO CLARO<br>4MM 2.55X3.66<br>1 END CAP CON 54 LAMINAS<br>VIDRIO FLOTADO CLARO 5.5MM 2.55X3.302<br>Y 25 LAMINAS VIDRIO FLOTADO CLARO<br>4MM 2.55X3.302<br>TOTAL DE LAMINAS 75,919<br><br>LINER IN/FREE OUT CUSTOMARY<br>QUICK DISPATCH. LIFO TERMS | P. Bruto<br>P. Neto | 7,590,631.00 KGS<br>7,254,631.00 KGS | |

SAID TO WEIGH AS VESSEL
HAD NO POSSIBILITY TO
ONBOARD CARGO.-

FREIGHT PREPAID
RECEIVED ON BOARD
CLEAN ON BOARD

**ORIGINAL**

| TOTAL NUMBER OF CONTAINERS | | |
|---|---|---|
| CONTAINER PACKING/LOADING | | |
| FREIGHT CHARGES INDICATED | PREPAID | COLLECT |
| | | |

| FREIGHT PAYABLE AT ORIGIN | PLACE AND DATE OF ISSUE ALTAMIRA, MEXICO Jun 14, 2004 |
|---|---|
| NUMBER OF ORIGINAL B/L 3 / 3 | FOR THE CARRIER NAVEMAR INTERNACIONAL, S.A. DE C.V. |
| Freight As Agreed | AS AGENTS.- |

# *Exhibit "7"*

Transcript of the Testimony of:

## Baldomero Gardea

Date: July 24, 2007

Case: AIG Mexico Seguros, Interamericana S.A. de C.V. v. M/V ZAPOTECA, et al.
05CV 5887 (JES)

*Tom Crites & Associates International, Inc.*
*P.O. Box 9438*
*Savannah, Georgia 31412*
*Phone: 800-631-3480*
*Fax: 912-233-7777*
*critesreporting@aol.com*
*www.critesintl.com*

496

Baldomero Gardea
AIG Mexico Seguros, Interamericana S.A. de C.V. v. MV ZAPOTECA, et al.

July 2

5 (Pages 1

## Page 14

KEANE - GARDEA

THE INTERPRETER: I can recall who was in charge of the logistics of Cristal Glass --

Q Okay.

THE INTERPRETER: -- not for the unloading of that ship in particular.

Q And who was that?

A Daniel Rodriguez Tato -- T-A-T-O.

(Whereupon, there was an off-the-record discussion.)

BY MR. KEANE:

Q What were the duties of Mr. Rodriguez, as you understood them?

THE INTERPRETER: He was responsible for the transportation of finished products, with the trucks, that are property of Cristal Glass.

Q Was he involved in arranging for the ocean transportation of finished products to Cristal Glass?

THE INTERPRETER: Yes -- he has not finished the answer.

THE INTERPRETER: He was responsible for programming and negotiating the purchase of glass out of Europe.

He's also in charge of programming the

## Page 15

KEANE - GARDEA

vessels, required on the right dates, to keep up with the operation. And, of course, he's involved in the ocean transportation.

Q Do you know if the cargo, which was shipped on the Zapoteca was -- whether there was a bill of lading issued for its carriage?

THE INTERPRETER: There's always an issuing of this bill of lading, but in this specific case, I did not receive -- sorry. I never received any bill of lading from any vessel.

Q Okay. You yourself specifically?

THE INTERPRETER: Yes, but as a procedure, we always receive a bill of lading.

Q Did you ever see the bill of lading, or a copy of the bill lading, involved in the shipment on the Zapoteca?

THE INTERPRETER: I don't recall.

Q Wasn't the procedure that an original bill of lading would have to be presented, to the vessel of the terminal where the cargo was discharged, in order for Cristal Glass to collect the cargo?

THE INTERPRETER: I am not sure. It must be, but I'm not sure.

Q Would that have been something that was

## Right column (page cut off)

KEANE - GARDEA

handled by the logistics department?

THE INTERPRETER: Yes.

Q Did you review any documents, before coming here this morning to testify?

THE INTERPRETER: No.

(Whereupon, the fax dated 3-6-06 with attached bill of lading was marked Deposition Exhibit 1 for identification.)

BY MR. KEANE:

Q Let me mark Composite Exhibit 1, a five page document, which is consists of a fax from Hill, Rivkins & Hayden to my office, with attached copies of two versions of bills of lading.

Sir, if you would, take a look at the documents attached to that cover sheet, which the copies of bills of lading, one of which your note says copy, non-negotiable, and the other says original which were provided to me by yo counsel.

I'll ask you if you have seen either of those two documents before -- if seeing them refreshes your recollection as to that?

THE INTERPRETER: I do recall having

KEANE - GARDEA

it, and it is a common format for the bills of lading.

Q Okay. Beyond recognizing the format of the bills of lading, do you have any recollection of having seen either of those two documents, either in copy or original form, prior to me showing them to you right now?

A It was three years ago, so maybe I did se it, but I cannot ensure that.

Q Okay. You don't have any clear, specific recollection as to seeing the bill of lading, including the cargo in the Zapoteca. I take it it's likely you did at some point, or might have, but beyond that you cannot say with any precisio is that fair?

THE INTERPRETER: I cannot ensure that

Q Do you have a file of the cargo carried onboard the Zapoteca?

THE INTERPRETER: I have some informa when I was in Spain, but I left everything there.

Q And would the file that was maintained, in reference to the cargo on the Zapoteca, would th have been held by your office, or that of the logistics department, or would there be more tha

HILL RIVKINS LLP
45 Broadway, Suite 1500, New York, NY 10006-3793
Tel: 212 669-0600 Fax: 212 669-0698/0699
e-mail: thefirm@hillrivkins.com
Website: www.hillrivkins.com

November 1, 2011

<u>BY HAND</u>

The Honorable Loretta A. Preska
United States District Judge
United States District Court
500 Pearl Street
New York, New York 10007

Re: AIG Mexico v. M/V ZAPOTECA, *et al.*
 05 Civ. 5887 (JES)
 <u>Our File No: 28789-KBD</u>

Honorable Madam:

We refer to the captioned matter and the very recent letter to the Court sent by Mr. Edward Keane on October 31st, 2011, regarding the last minute renewal of his previously denied motion to dismiss.

First and foremost, we should like to bring to the Court's attention that all of the witnesses who have testified in the extensive pre-trial discovery were produced by this office on behalf of plaintiff. It is extremely disingenuous therefore for counsel for the defendant to state that "...none of the witnesses who testified for plaintiff had any first hand involvement with the bill of lading...". If counsel for the defendant was in earnest when this matter was before the Honorable John E. Sprizzo in 2005/2006, he would have presumably produced for testimony a witness who actually knew something about the pertinent bill of lading.

NEW JERSEY
102 South Broadway
South Amboy, NJ 08879-1708
Tel. 732 838-0300 Fax: 732 316-2368
e-mail: thefirm@hillrivkins.com

TEXAS
55 Waugh Drive, Suite 1200
Houston, Texas 77007
Tel. 713 222-1515 Fax: 713 222-1359
e-mail: thefirm@hillrivkins.com

CALIFORNIA
Hill Rivkins/Brown & Associates
11140 Fair Oaks Boulevard, Suite 100
Fair Oaks, CA 95628-5126
Tel: 916 535-0263 Fax: 916 535-0268
e-mail: thefirm@brnlaw.com

The Honorable Loretta A. Preska
United States District Judge
November 1, 2011
Page Three

For this and other reasons, plaintiff strenuously urges that the re-hearing of defendant's motion be denied with prejudice.

Respectfully submitted,

HILL RIVKINS LLP

Keith B. Dalen

KBD:mgw
Enclosure
173-Judge Preska

cc: Mahoney & Keane, LLP
Attn: Edward A. Keane, Esq.
*Via e-mail: ekeane@mahoneykeane.com*

HILL RIVKINS

LOCKHEED MARTIN CORPORA-
TION, Robert Stevens, Bruce Tanner,
and Linda Gooden, Defendants.

No. 11 Civ. 5026 (JSR).

United States District Court,
S.D. New York.

Feb. 21, 2012.

CITY OF PONTIAC GENERAL EM-
PLOYEES' RETIREMENT SYSTEM,
Individually and on Behalf of All Oth-
ers Similarly Situated, Plaintiff,

v.